Filed:  September 11, 1997

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 96-1650
(CA-95-126-1-T)

Steven Douglas Jenkins, et al,

Plaintiffs - Appellees,

versus

Bobby Lee Medford, etc.,

Defendant - Appellant.

O R D E R

The Court amends its opinion filed August 7, 1997, as follows:

On page 2, section 2, lines 5-6 -- the sentence is corrected to read "Judge Motz wrote a dissenting opinion, in which Judge Hall, Judge Murnaghan, and Judge Michael joined."

On page 33, second full paragraph, line 3 -- the cross-reference is corrected to read "Majority op. at 15."

For the Court - By Direction

/s/ Patricia S. Connor

Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

STEVEN DOUGLAS JENKINS; DAVID CHRIS
BOSSARD; WILLIAM MARTIN BUCKNER;
ROBERT CALVIN DAVIS; ELMEDA MILLER
FOSTER; JIMMY LYNN HUNGERFORD;
LINDA COOK MCDANIEL; RANDY LEE
MOSS; SANDY HOGLEN MOSS;
KIMBERLY DIANN SHELTON,
Plaintiffs-Appellees,

v.

BOBBY LEE MEDFORD, Individually and
in his official capacity as Sheriff of
Buncombe County, North Carolina,

No. 96-1650

Defendant-Appellant,

and

RELIANCE INSURANCE COMPANY, INC., a
Pennsylvania Corporation,
Defendant,

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
SOUTHERN STATES POLICE BENEVOLENT
ASSOCIATION, AMERICAN CIVIL LIBERTIES
UNION OF NORTH CAROLINA LEGAL
FOUNDATION, INCORPORATED,
Amici Curiae.

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Lacy H. Thornburg, District Judge.
(CA-95-126-1-T)

Argued: December 3, 1996

Decided: August 7, 1997

Before WILKINSON, Chief Judge, and RUSSELL, WIDENER, HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER, HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ, Circuit Judges, sitting en banc.

_____

Reversed and remanded by published opinion. Judge Russell wrote the majority opinion, in which Chief Judge Wilkinson, Judge Widener, Judge Niemeyer, Judge Wilkins, Judge Hamilton, Judge Luttig, and Judge Williams joined. Judge Ervin wrote a dissenting opinion. Judge Motz wrote a dissenting opinion, in which Judge Hall, Judge Murnaghan, and Judge Michael joined.

_____

## COUNSEL

**ARGUED:** William Alfred Blancato, BENNETT & BLANCATO, L.L.P., Winston-Salem, North Carolina, for Appellant. C. Frank Goldsmith, Jr., GOLDSMITH & GOLDSMITH, P.A., Marion, North Carolina, for Appellees. **ON BRIEF:** Tony Seaton, Lee P. Herrin, Johnson City, Tennessee, for Appellees.

_____

## OPINION

RUSSELL, Circuit Judge:

Bobby Lee Medford ("Medford") was elected sheriff of Buncombe County, North Carolina, in November 1994. The plaintiffs in this action were deputy sheriffs, serving as employees. Shortly after his election, he dismissed several deputy sheriffs, particularly the plaintiffs-appellees ("deputies") in this case. These deputies filed suit under 42 U.S.C. § 1983, alleging violations of their rights under the First and Fourteenth Amendments to the United States Constitution. They asserted that they were dismissed for failing to support Medford's election bid, for supporting other candidates, and for failing to associate themselves politically with Medford's campaign. They also filed a pendent claim under state law.

2

Medford responded by filing a motion to dismiss for failure to state a claim.**1** In the brief supporting his motion, Medford asserted, <u>inter alia</u>, that he was entitled to qualified immunity. The matter was referred to a magistrate judge, who recommended that Medford's motion be granted because the deputies had failed to state a claim. The magistrate judge also recommended that Medford be afforded qualified immunity.

The deputies objected to the magistrate's report and recommendation, and the district court declined to adopt it. The district court denied Medford's motion to dismiss, and also rejected the magistrate's recommendation of qualified immunity for Medford. Furthermore, the district court believed that Medford's entitlement to qualified immunity might rest on factual issues not yet before the court, and so ruled that "the Court cannot now determine whether [Medford] is entitled to a qualified immunity defense."

I.

Our first step is to determine our jurisdiction over this appeal. Normally, a denial of a motion to dismiss is not appealable, because it is not a final order as contemplated under 28 U.S.C. § 1291. When a district court denies a motion to dismiss that is based on qualified immunity, however, the action is a final order reviewable by this court.**2**

_____

**1** Fed. R. Civ. P. 12(b)(6).

**2** <u>Behrens v. Pelletier</u>, 116 S. Ct. 834, 839 (1996) ("[A]n order rejecting the defense of qualified immunity at <u>either</u> the dismissal stage <u>or</u> the summary-judgment stage is a `final' judgment subject to immediate appeal.").

In any event, pendent appellate jurisdiction allows us to review the district court's denial of the motion to dismiss. Judge Wilkins recently established that pendent appellate jurisdiction is appropriate when a subsidiary issue "is (1) inextricably intertwined with the decision of the lower court to deny qualified immunity or (2) consideration of the additional issue is necessary to ensure meaningful review of the qualified immunity question." <u>Taylor v. Waters</u>, 81 F.3d 429, 437 (4th Cir. 1996) (citing <u>Swint v. Chambers County Comm'n</u>, 115 S. Ct. 1203, 1212 (1995)).

The policy underlying the defense of qualified immunity supports our exercise of jurisdiction at this point. The defense exists to "give government officials a right, not merely to avoid `standing trial,' but also to avoid the burdens of `such pretrial matters as discovery.'"**3** When a district court denies qualified immunity at the dismissal stage, that denial subjects the official to the burdens of pretrial matters, and some of the rights inherent in a qualified immunity defense are lost.**4** In this case, the district court refused to rule on the question of qualified immunity, reasoning that because Medford had not yet filed an answer, he had not asserted the defense of qualified immunity. The district court was incorrect. Qualified immunity may be raised in a motion to dismiss.**5** The district court's refusal to consider the question subjected Medford to further pretrial procedures, and so effectively denied him qualified immunity.

II.

We review a denial of a motion to dismiss based on qualified immunity de novo.**6** We accept as true the facts as alleged in the complaint, and view those facts in the light most favorable to the non-moving party.**7** In this case, the complaint and amended complaint allege the following facts that are relevant to this appeal: on and before December 5, 1994, the deputies were employed in law enforcement positions in the Buncombe County sheriff's department; Medford ran against Walter Hipps in May, 1994, in the Republican

_____

We may exercise jurisdiction in this case under either prong of the Taylor test. At a minimum, the motion to dismiss was "inextricably intertwined" with Medford's claim of qualified immunity. See also Jackson v. Long, 102 F.3d 722, 731 (4th Cir. 1996) (concluding that when complaint did not adequately state claim against which immunity could attach, district court should have dismissed complaint).

**3** Id. (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). See also Harlow v. Fitzgerald, 457 U.S. 800, 817 (1982).

**4** Behrens, 116 S. Ct. at 839-40.

**5** See id. at 839.

**6** Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996) (citation omitted).

**7** Id.

4

primary; Medford won that election, and ran for sheriff against the incumbent, Charles Long, in an election held on November 8, 1994; during the campaign, Medford promised his supporters either jobs or promotions in the sheriff's department; the deputies worked for or otherwise supported Medford's opponents, but always on their own time, and never at work; each deputy was terminated by Medford on December 5, 1996, the date Medford took office as the newly-elected sheriff; Medford made no attempt to assess the abilities of any of the deputies; and, Medford replaced each deputy with someone politically loyal to Medford.

The district court ruled that the facts alleged in the amended complaint were sufficient to state a cause of action. Under 42 U.S.C. § 1983, a plaintiff must establish three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law.[8] Medford argues on appeal, as he did in the court below, that he is entitled to qualified immunity because the deputies have not alleged a violation of a "clearly established" right; he is immune from suit under the 11th Amendment to the United States Constitution; and the pendent state law claim should be dismissed. The deputies assert that by firing them, Medford deprived them of "their rights to freedom of association and to political belief, speech and expression, and their Fourteenth Amendment right to due process of law."[9]

De novo review allows us to conduct an overall inquiry into the sufficiency of the complaint to determine whether the deputies have stated a claim upon which relief may be granted.[10] When reviewing a claim of qualified immunity, we consider whether the plaintiff has been deprived of a constitutional right. If the complaint shows that the plaintiff has not suffered such a deprivation, the defendant is entitled to dismissal of the claim under Rule 12(b)(6).[11] These steps help

---

[8] 42 U.S.C.A. § 1983 (West 1994); West v. Atkins, 487 U.S. 42, 48 (1988).

[9] Amended Complaint, ¶ 36.

[10] Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996).

[11] ACLU of Maryland v. Wicomico County, 999 F.2d 780, 784 (4th Cir. 1993).

5

"weed out insubstantial § 1983 claims" without subjecting the defendant to the burdens of pretrial preparations.**12** We believe the dispositive issue in this case is whether the deputies' dismissals deprived them of any constitutional right. We therefore turn to an examination of the applicable law.

III.

Today, we are again asked to determine when a public employee may properly be dismissed because of political affiliation. Over the last two decades, the United States Supreme Court has issued four significant opinions on this issue.**13** Despite the Court's guidance, lower courts have issued "conflicting and confusing" opinions.**14** It is clear, however, that "[a] State may not condition public employment on an employee's exercise of his or her First Amendment rights."**15** Further, "[a]bsent some reasonably appropriate requirement, government may not make public employment subject to the express condition of political beliefs or prescribed expression."**16**

The deputies' complaint is properly analyzed under the reasoning developed in Elrod v. Burns**17** and Branti v. Finkel.**18** The wholesale dismissal of deputies who campaigned for the losing candidate reveals that the newly-elected sheriff "elevate[d] political support to a job requirement."**19** This implicates the constitutional analysis of

_____

**12** Id. (citing Siegert v. Gilley, 111 S. Ct. 1789, 1793 (1991)).

**13** See O'Hare Truck Service, Inc. v. City of Northlake, 116 S. Ct. 2353 (1996); Rutan v. Republican Party of Illinois , 497 U.S. 62 (1990); Branti v. Finkel, 445 U.S. 507 (1980); Elrod v. Burns, 427 U.S. 347 (1976) (plurality opinion).

**14** Upton v. Thompson, 930 F.2d 1209, 1212 (7th Cir. 1989).

**15** O'Hare, 116 S. Ct. at 2356 (1996) (citing Board of Comm'rs v. Umbehr, 116 S. Ct. 2342 (1996); Perry v. Sindermann, 408 U.S. 593 (1972); Pickering v. Board of Educ., 391 U.S. 563 (1968); Keyishian v. Board of Regents, 385 U.S. 589 (1967)).

**16** Id. at 2357.

**17** 427 U.S. 347.

**18** 445 U.S. 507.

**19** Terry v. Cook, 866 F.2d 373, 377 (11th Cir. 1989).

6

political patronage as developed in the Elrod-Branti line of cases.**20** In 1976, in Elrod, the Court declared patronage dismissals unconstitutional, because the practice limited political belief and association, and therefore violated the First and Fourteenth Amendments. However, the Court created a narrow exception to give effect to the democratic process. The Court allowed patronage dismissals of those holding policymaking positions, reasoning that this exception would, in part, advance the important government goal of assuring "the implementation of policies of [a] new administration, policies presumably sanctioned by the electorate."**21**

Four years later, in Branti, the Court recognized that the labels used in Elrod ignored the practical realities of job duty and structure, and so modified the test: "[T]he ultimate inquiry is not whether the label `policymaker' or `confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."**22** Simply put, Branti modified the test in Elrod by asking if "there is a rational connection between shared ideology and job performance."**23**

A.

This court, in Jones v. Dodson,**24** had its first opportunity to apply the Elrod-Branti exception to dismissals based on campaign activity. Dodson considered the claims of two Democratic deputy sheriffs, who alleged they were dismissed by the sheriff, a Republican, because of their political affiliations and expressions.**25** The panel held

_____

**20** Id. When public employees are subjected to discipline for the content of their speech, courts analyze those claims under the Connick-Pickering line of cases. Joyner v. Lancaster, 815 F.2d 20, 22-3 (4th Cir. 1987) (citing Connick v. Myers, 461 U.S. 138 (1983); Pickering, 391 U.S. 563)).

**21** Elrod, 427 U.S. at 367.

**22** Branti, 445 U.S. at 518.

**23** Stott v. Haworth, 916 F.2d 134, 142 (4th Cir. 1990) (citing Savage v. Gorski, 850 F.2d 64, 68 (2d Cir. 1988)).

**24** 727 F.2d 1329 (4th Cir. 1984).

**25** Id. at 1330.

that "if [the deputy's] discharge was solely because of his political party affiliation, it could not as a matter of law be justified under the <u>Branti</u> test."**26** The panel reasoned:

> [W]e do not believe that the duties of deputy sheriffs, no matter what the size of the office, or the specific position of the power involved, or the customary intimacy of the associations of the office, or the undoubted need for mutual trust and confidence within any law enforcement agency, could be found to involve policymaking related to partisan political interests and to involve access to confidential information bearing . . . on partisan political concerns.**27**

The panel did not, however, make an explicit inquiry into the specific role or duties of deputy sheriffs, nor did it explore the relationship between the sheriff and his deputies, as that relationship affects the execution of the sheriff's policies.

In <u>Joyner v. Lancaster</u>,**28** another panel of this court examined the claims of a deputy sheriff who was dismissed because he campaigned on behalf of the incumbent sheriff's opponent.**29** Because <u>Joyner</u> focused on one deputy whose campaign activity caused friction within the department, the panel applied the <u>Connick-Pickering</u> analysis.**30** Nonetheless, <u>Joyner</u> is instructive because the court specifically examined deputy Joyner's role in the sheriff's department. Joyner was one of four captains in a department of some 150 deputies. He had only two superiors and was in charge of a squad of 15 deputies. He helped with department planning, and reviewed and evaluated other deputies.**31** Furthermore, Joyner played an important role in implementing the sheriff's policies, "and he was an essential link between the sheriff and the deputies whom he supervised."**32** The

_____

**26** <u>Id.</u> at 1338.

**27** <u>Id.</u> (citing <u>Branti</u>, 445 U.S. at 519, 520 n.14) (internal quotation marks omitted).

**28** 815 F.2d 20 (4th Cir. 1987).

**29** <u>Id.</u> at 22-3.

**30** <u>Id.</u>

**31** <u>Id.</u> at 21.

**32** <u>Id.</u> at 24.

panel recognized that in those circumstances, "mutual confidence and loyalty are of great importance," and approved Joyner's dismissal.**33**

In Stott v. Haworth,**34** yet another panel addressed politically-motivated dismissals of public employees. Stott refined the inquiry courts in this circuit should make when applying the Elrod-Branti analysis. The court must first determine whether the position held by the dismissed employee relates to partisan political interests. If the position does relate to those interests, the court must then examine the particular responsibilities of the position. When the position at issue resembles a policymaker, a communicator, or a privy to confidential information, political party affiliation can be an appropriate requirement for effective job performance.**35** The position then falls into the Elrod-Branti exception to the prohibition against political firings.**36**

Our cases have moved from wholesale pronouncements (Dodson) to position-specific analyses (Joyner andStott).**37** Other circuits,however, simply refuse to allow deputy sheriffs to pursue the type of claim at issue before us.**38** In reaching the decision to bar these claims, they have examined sheriff elections and the roles of sheriffs and their deputies. These circuits have found that sheriffs, as elected officers, require loyal deputies to help them implement their policies-- "policies presumably sanctioned by the electorate."**39**

---

**33** Id.

**34** 916 F.2d 134. Stott involved a wide range of civil service employees, not deputy sheriffs. We nonetheless find the case useful because of its application of the Elrod-Branti analysis.

**35** Id. at 141-42.

**36** Id. at 142.

**37** This narrowing of the holding of Dodson would also serve to defeat an assertion that the deputies had a "clearly established" right to continued employment after the election. Thus, Medford would be entitled to qualified immunity. See DiMeglio v. Haines, 454 F.3d 790, 794 (4th Cir. 1995).

**38** Upton, 930 F.2d 1209; Cook, 866 F.2d 373.

**39** Elrod, 427 U.S. at 367.

9

B.

In jurisdictions where the sheriff is elected by popular vote, the triumph of one candidate indicates voter approval of the candidate's espoused platform and general agreement with the candidate's "expressed political agenda."[40] Some candidates gain office by promising changes in current policy. By choosing a particular candidate to protect the citizens of the county, the electorate vests in the sheriff broad discretion to set and implement the policies necessary to carry out his goals.[41] The sheriff owes a duty to the electorate and the public at large to ensure that his espoused policies are implemented.

Deputy sheriffs play a special role in implementing the sheriff's policies and goals. The sheriff is likely to include at least some deputies in his core group of advisors.[42] Deputies on patrol work autonomously, exercising significant discretion in performing their jobs.[43] In the course of their duties, deputies will "make some decisions that actually create policy."[44] The sheriff relies on his deputies to foster public confidence in law enforcement. Furthermore, deputies are expected to provide the sheriff with the truthful and accurate information he needs to do his job.[45] In some jurisdictions, the deputy sheriff is the general agent of the sheriff, and the sheriff is civilly liable for the acts of his deputy.[46]

The circuits which have examined the interplay between the voters,

_____

[40] Upton, 930 F.2d at 1215.

[41] Id. at 1215 (drawing parallel between deputy sheriffs and public prosecutors) (citing Livas v. Petka, 711 F.2d 798 (7th Cir. 1983)); McBee v. Jim Hogg County, 703 F.2d 834, 839, vacated on other grounds, 730 F.2d 1009 (5th Cir. 1983).

[42] Upton, 930 F.2d at 1215.

[43] Id. at 1215.

[44] Id. (citing Livas, 711 F.2d 798, 801); McBee, 703 F.2d at 839 ("[D]eputies are often called upon to make on-the-spot split-second decisions effectuating the objectives and law enforcement policies which a particular sheriff has chosen to pursue.").

[45] Upton, 930 F.2d at 1215.

[46] Cook, 866 F.2d at 377 (discussing Alabama law).

the sheriff and his policies, and the role of deputies in implementation of policy, have concluded that political affiliation and loyalty to the sheriff are appropriate job requirements. These circuits have held that the position of deputy sheriff is sufficiently political to allow patronage and politically-motivated dismissals under the exception established by Elrod and Branti.[47]

C.

Following the lead of the Seventh[48] and Eleventh[49] Circuits, we now consider the specific political and social roles of sheriffs and their deputies in North Carolina. The North Carolina legislature has declared that "[t]he offices of sheriff and deputy sheriff are . . . of special concern to the public health, safety, welfare and morals of the people of the State."[50] The sheriff is such an important political figure, the legislature has prescribed a mandatory procedure for filling vacancies in that office: "If the sheriff were elected as a nominee of a political party, the board of commissioners shall consult the county executive committee of that political party . . . and shall elect the person recommended" by that party.[51]

_____

[47] See Upton, 930 F.2d at 1218 ("[W]e conclude that deputy sheriffs operate with a sufficient level of autonomy and discretionary authority to justify a sheriff's use of political considerations when determining who will serve as deputies."); Cook, 866 F.2d at 377 ("Under the Elrod-Branti standard, loyalty to the individual sheriff and the goals and policies he seeks to implement through his office is an appropriate requirement for the effective performance of a deputy sheriff. . . . [A] sheriff [has] absolute authority of appointment and to decline to reinstate those who did not support him.") (emphasis added); McBee, 703 F.2d 834.

See also Wilbur v. Mahan, 3 F.3d 214, 217 (7th Cir. 1993) ("A public agency would be unmanageable if its head had to appoint or retain his political enemies . . . in positions of confidence or positions in which they would be making policy or, what amounts to the same thing, exercising discretion in the implementation of policy.").

[48] See Upton, 970 F.2d 1209.

[49] See Cook, 866 F.2d 373.

[50] N.C. Gen. Stat. § 17E-1 (1996).

[51] N.C. Gen. Stat. § 162-5.1 (1996) (emphasis added).

11

The North Carolina legislature has also recognized the special status of sheriffs' deputies in the eyes of the law:"The deputy sheriff has been held by the Supreme Court of this State to hold an office of special trust and confidence, acting in the name of and with powers coterminous with his principal, the elected sheriff."[52] The sheriff may not delegate final responsibility for his official duties,[53] but he may appoint deputies to assist him.[54] Our circuit and North Carolina state courts agree that the sheriff can be held liable for the misbehavior of the deputies.[55] Presumably it is for these reasons that the legislature has made deputies at-will employees, who "shall serve at the pleasure of the appointing officer."[56]

---

[52] Id. § 17E-1. See Gowens v. Alamance County, 3 S.E.2d 339, 340 (N.C. 1939); Cline v. Brown, 210 S.E.2d 446, 449 (N.C. App. 1974) ("The deputy is a representative of the sheriff in his official capacity. . . . The public generally regards the acts of a deputy sheriff as the acts of the sheriff himself. The sheriff's position in government vests in him and his deputies `substantial responsibility for or control over the conduct of governmental affairs.' This is certainly true where law enforcement and police functions are concerned. . . . [I]f the deputy's office [is] abused, it has great potential for social harm and thus invites independent interest in the qualifications and performance of the person or persons who hold the position."), cert. denied, 211 S.E.2d 793 (N.C. 1975) (citation omitted).

[53] N.C. Gen. Stat. § 162-24.

[54] Id.

[55] McCollum v. Stahl, 579 F.2d 869, 872 (4th Cir. 1978) ("[I]llegal conduct on the deputy's part could expose the Sheriff to civil liability. Indeed, in law he occupied a status of alter ego of the Sheriff officially.") (emphasis in original); Sutton v. Williams, 155 S.E.2d 160, 161-62 (N.C. 1930) ("At common law, if a jailer permitted the escape of a prisoner, . . . the sheriff had to answer for the default. . . . [N]ow, as a general rule, subject of course to exceptions, a sheriff is liable for the act or omission of his deputy as he is for his own.") (citations omitted); Styers v. Forsyth County, 194 S.E. 305, 308-09 (N.C. 1937) (sheriff liable on his surety bond for acts of deputy; "If there be a nonfeasance or neglect of duty by the under-sheriff, the sheriff alone is responsible to the party injured . . . .").

[56] N.C. Gen. Stat. § 153A-103(2) (1996).

IV.

This examination of the role of deputy sheriffs leads us to conclude that in North Carolina, the office of deputy sheriff is that of a policy-maker, and that deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is liable. We therefore hold that such North Carolina deputy sheriffs may be lawfully terminated for political reasons under the Elrod-Branti exception to prohibited political terminations. This holding "strikes at the heart of the Elrod-Branti least restrictive means test which balances First Amendment rights of the deputies and the need for efficient and effective delivery of public services."[57] Because they campaigned for Medford's opponents, the deputies in the instant case had no constitutional right to continued employment after the election, and so have failed to state a claim under 42 U.S.C. § 1983.

We recognize that this holding conflicts with our holding in Jones v. Dodson. Dodson was this court's first opportunity to apply the Elrod-Branti reasoning to patronage dismissal claims brought by sheriff's deputies. We believe Dodson has handicapped and impeded law enforcement since it became the law of this circuit. The intervening years and cases since Dodson reveal that sheriffs have been forced to defend themselves in litigation for dismissing deputies who campaigned against them,[58] thus diverting sheriffs' attention from the important public safety issues in their communities. Additionally, we believe the Dodson panel misapplied the Elrod-Branti test.

Dodson rested on language in Branti rejecting the "notion that mutual trust and confidence could only exist between members of the same political party in an agency of the small size there involved."[59] Branti involved the dismissal of assistant public defenders, who were Republicans, by the newly-appointed public defender, a Democrat. The Court reasoned that political affiliation was an inappropriate

_____

[57] Cook, 866 F.2d at 377.

[58] Joyner, 815 F.2d 20 (North Carolina sheriff); Harris v. Wood, 888 F.Supp. 747 (W.D. Va. 1995); Pierson v. Gondles, 693 F.Supp. 408 (E.D. Va. 1988); Whited v. Fields, 581 F.Supp. 1444 (W.D. Va. 1984).

[59] Jones, 727 F.2d at 1338 (citing Branti, 445 U.S. at 520 n.14).

13

basis for dismissal because the primary, if not the only, responsibility of an assistant public defender is to represent his clients' interests in controversies with the State. The Court concluded that in serving that interest, an assistant public defender was not a policymaker or privy to confidential information related to partisan politics.[60]

We disagree with Dodson to the extent it suggests that no deputy sheriff can ever be a policymaker. Instead, the district courts are to engage in a Stott-type analysis, examining the specific position at issue, as we have done here today. If the position resembles "a policy-maker, a communicator, or a privy to confidential information,"[61] then loyalty to the sheriff is an appropriate requirement for the job. We hold that newly elected or re-elected sheriffs may dismiss deputies either because of party affiliation or campaign activity. Either basis serves as a proxy for loyalty to the sheriff.[62]

We can think of no clearer way for a deputy to demonstrate opposition to a candidate for sheriff, and thus actual or potential disloyalty once the candidate takes office, than to actively campaign for the candidate's opponent. That is the exact measure employed by Sheriff Medford in this case.[63] The deputies admit that they campaigned on behalf of Medford's opponents.[64] "It was never contemplated that . . . sheriffs . . . must perform the powers and duties vested in them through deputies or assistants selected by someone else,"[65] and we do not believe it was ever contemplated that a sheriff must attempt to implement his policies and perform his duties through deputies who have expressed clear opposition to him.

_____

[60] Branti, 455 U.S. at 519-20.

[61] Stott, 916 F.2d at 141-42.

[62] Party affiliation as a proxy for loyalty was noted by the Court in Branti. "[T]he Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments." Branti, 445 U.S. at 518.

[63] Amended Complaint, ¶ 32.

[64] Amended Complaint, ¶ 26.

[65] Tanner v. McCall, 625 F.2d 1183, 1186 (5th Cir. 1980) (quoting Blackburn v. Brorein, 70 So.2d 293, 298 (Fla. 1954)).

14

We limit dismissals based on today's holding to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff. We issue this limitation to caution sheriffs that courts examine the job duties of the position, and not merely the title, of those dismissed.**66** Because the deputies in the instant case were law enforcement officers, they are not protected by this limitation.**67**

We reverse the ruling of the district court and hold the deputies failed to state a claim. This holding makes it unnecessary for us to consider whether Sheriff Medford is entitled to qualified immunity.**68** We direct the district court to dismiss the deputies' claim. In the absence of a federal action, the deputies' claim under state law should also be dismissed.**69**

For the foregoing reasons, the order of the district court is reversed, and the case is remanded to the district court for the entry of an appropriate order of dismissal.

REVERSED AND REMANDED

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

Ten Buncombe County deputy sheriffs brought this suit against the newly elected sheriff, Bobby Medford, alleging that he discharged

_____

**66** See Stott, 916 F.2d at 142; Zorzi v. County of Putnam, 30 F.3d 885, 892 (7th Cir. 1994) (dispatchers not involved in law enforcement activities or policy, so political affiliation inappropriate job requirement).

The dissent manifests a misunderstanding of our holding. It applies only to those who meet the requirements of the rule as we state it, and does not extend to all 13,600 officers in North Carolina, as the dissent suggests.

**67** Amended Complaint, ¶ 19.

**68** DiMeglio, 45 F.3d at 799 (when reviewing determinations on both a motion to dismiss for failure to state a claim and a denial of qualified immunity, courts are "free to decide the case on the most expedient ground.").

**69** Tarantino v. Baker, 825 F.2d 772, 779 (4th Cir. 1987) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726-27 (1966)).

15

them because they failed to associate themselves with his political campaign and because they actively spoke and campaigned for his opponent. These allegations state two separate First Amendment claims, either of which, if proved, would entitle the deputies to relief: namely, a political affiliation claim under Elrod v. Burns, 427 U.S. 347 (1976), and Branti v. Finkel, 445 U.S. 507 (1980), and a claim for protected employee speech on a matter of public concern under Pickering v. Board of Educ. of Township High School Dist., 391 U.S. 563 (1968), and Connick v. Myers, 461 U.S. 138 (1983). The majority misstates and misapplies the Supreme Court's analysis in Elrod and Branti, and ignores altogether the Pickering-Connick claim. Accordingly, I must respectfully dissent.

I.

The majority fundamentally errs in its Elrod-Branti analysis. It fails to engage in a particularized examination of the actual duties of each deputy to determine whether Sheriff Medford has met the burden of showing that party affiliation is an acceptable job requirement, an analysis required under Elrod and Branti. The majority also totally disregards the Supreme Court's teachings as to what sort of duties may permit a public employer to make political affiliation a job requirement.

Instead, the majority broadly holds that all deputy sheriffs in North Carolina -- regardless of their actual duties-- are policymaking officials. As a result, when North Carolina deputies exercise their First Amendment right to engage in a political campaign or associate with a political party, they now do so at risk of losing their jobs. This all-encompassing holding is made without any inquiry into the actual job duties of the deputies before us and in the face of a record consisting only of the limited facts pled in the complaint, none of which support the holding. In order to come to this holding, on these skeletal facts, the majority must expand the narrow exception to the general rule announced in Elrod and Branti to the extent that the exception swallows the rule.

A.

The Supreme Court held in Elrod, and reiterated in Branti, that the First Amendment prohibits the dismissal of public employees "solely

16

for the reason that they were not affiliated with or sponsored by" a certain political party. Branti, 445 U.S. at 517 (quoting Elrod, 427 U.S. at 350). The only exception to this rule is when "party affiliation" constitutes "an acceptable requirement for . . . government employment." Id. Thus, when a public employee holds a confidential or policymaking position, his employer may be justified in discharging him because of his party affiliation but only if the employer "can demonstrate that party affiliation is an appropriate job requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518. For this reason, "the ultimate inquiry is not whether the label `policymaker' or `confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Id.

While the majority pays lip service to some of these principles, it resolutely refuses to follow them. Instead, it holds "[i]f the position resembles `a policymaker, a communicator, or a privy to confidential information,' then loyalty to the sheriff is an appropriate requirement for the job." (emphasis added) (footnote omitted). This holding flies in the face of the Supreme Court's teaching that "party affiliation is not necessarily relevant to every policymaking or confidential position." Id.

The majority also ignores the Court's mandate that in each case a public employer must "demonstrate" that "party affiliation" constitutes a proper requirement "for the effective performance of the public office involved." Id. (emphasis added). See also Elrod, 427 U.S. at 368 (characterizing this as the "government's burden"). The majority does not require the sheriff to bear any "burden" or "demonstrate" in any way that party affiliation is an appropriate requirement for the effective performance of the particular "public office involved." Id. Indeed, it engages in no analysis of the particular duties of each deputy.

In view of this, the majority's criticism of Jones v. Dodson, 727 F.2d 1329 (4th Cir. 1984), as a "wholesale pronouncement[ ]" on the status of deputy sheriffs instead of a "position-specific analys[is]" is indeed ironic. Although the majority is likely correct that a proper Elrod-Branti analysis, see e.g., Branti, 445 U.S. at 519-20, requires

17

a more detailed, position-specific and fact-based analysis than we applied in <u>Dodson</u>, the majority utterly fails to heed its own warning against "wholesale pronouncements." Instead, it finds that <u>all</u> North Carolina deputy sheriffs are policymakers -- without ever considering the positions held by each of the deputies at issue or their specific job duties.

This may be because even a cursory examination of the facts here would not permit the majority's holding. The only facts we have before us are the deputies' allegations that their "job requirements consisted of performing <u>ministerial</u> law enforcement duties for which political affiliation is not an appropriate requirement" and that none of them "occupied a policymaking or confidential position." (emphasis added).

Perhaps another reason why the majority refuses to engage in the "position-specific analysis" that it acknowledges <u>Elrod</u> and <u>Branti</u> mandate is because when the Supreme Court applied that analysis -- in <u>Elrod</u> itself -- to facts virtually identical to those alleged here it unequivocally held that the plaintiffs did state a cause of action. In <u>Elrod</u>, as in the present case, all of "the plaintiffs were deputy sheriffs." <u>Burns v. Elrod</u>, 509 F.2d 1133, 1136 (7th Cir. 1975). They brought suit against a newly elected sheriff, who, like Sheriff Medford, "assume[d] office from a Sheriff of a different political party." <u>Elrod</u>, 427 U.S. at 351. Like the deputies here, they alleged that the new sheriff discharged them because of their party affiliation. <u>Id.</u> at 350. As here, the defendant sheriff submitted no evidence but simply moved to dismiss the deputies' complaint for failure to state a claim. <u>Id.</u> As the majority directs the district court to do here, the district court in <u>Elrod</u> granted that motion and dismissed the deputies' complaint. <u>Id.</u>

In view of the majority's holding, one would think that the Supreme Court upheld that dismissal -- but it did not. Rather, the Court held that because "the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments" the deputies had "stated a valid claim for relief." <u>Id.</u> at 373. Accordingly, the Court affirmed the court of appeals, which had <u>reversed</u> the district court and found the deputies were entitled to a preliminary injunction preventing partisan discharges, and directed that, if the

18

sheriff wished to assert that any of the deputies were policymakers whose duties made party affiliation a job requirement, he would have to shoulder that "burden" on remand. Id. at 368, 373-74.

Thus, at precisely the same procedural stage and on virtually identical factual allegations as those here, the Supreme Court in Elrod expressly held that dismissal for failure to state a claim is not proper. The majority never confronts this fundamental, and I believe, insurmountable obstacle to its extraordinary holding here. Even if the facts and holding in Elrod were not on all fours with those in the case at hand, the majority's holding cannot be reconciled with the Supreme Court's further teachings as to the kind of employees who do, and do not, constitute policymaking officials for purposes of the narrow Elrod-Branti exception.

As an example of an official who might meet this exception the Branti Court suggested that "the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his view to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments." Branti, 445 U.S. at 518. However, the Court expressly held that "the continued employment of an assistant public defender cannot properly be conditioned upon his allegiance to [a] political party" because a public defender's "primary responsibility is to serve the undivided interests of his client" and "[t]hus, whatever policy making occurs in the public defender's office must relate to the needs of individual clients and not to any partisan political interests." Branti, 507 U.S. at 519. Nothing in the skeletal pleadings before us suggests that the plaintiffs here performed tasks even remotely similar to those of a gubernatorial press or legislative aide. Indeed, deputy sheriffs would generally appear to have fewer policymaking duties than assistant public defenders. Furthermore, the plaintiff deputies allege that they performed only "ministerial law enforcement duties" and occupied no "policymaking or confidential position."

In sum, the Supreme Court has directed that a court inquire as to whether the "hiring authority" can "demonstrate" that party affiliation is an "appropriate" requirement for the "effective performance of the public office involved." Id. The majority utterly refuses to do this. If

19

it did, it could only conclude that Sheriff Medford has failed to "demonstrate" any such thing. Rather, on the limited facts available at this time as to the actual job duties of the ten plaintiff deputies, there is no basis for concluding that party affiliation is an"appropriate" requirement for the effective performance of their duties.

B.

Instead of relying upon the actual job duties of the deputies before us and determining whether those duties require membership in a particular political party, as the Supreme Court has directed, the majority relies on broad, and often misleading, generalizations concerning North Carolina law.

First, the majority asserts that because a sheriff is elected to his post as the candidate of one political party with an"expressed political agenda," he is entitled to require that his deputies belong to the same party. The elected status of an employer cannot be a significant factor, however, because most, if not all, political firing cases begin with the <u>election</u> of an official, presumably with "an expressed political agenda." <u>See</u>, <u>e.g.</u>, <u>Elrod</u>, 427 U.S. at 351; <u>Branti</u>, 445 U.S. at 509. The critical question is not whether the sheriff was elected as a candidate of one party, with an agenda, but whether each one of his deputies must be a member of the sheriff's political party in order to "effective[ly] perform[ ]" his"public office." <u>Id.</u>

In answering that question the majority suggests that deputy sheriffs exercise "significant discretion in performing their jobs," relying on a case interpreting the responsibilities of <u>Illinois</u> deputy sheriffs. <u>See Upton v. Thompson</u>, 930 F.2d 1209, 1215 (7th Cir. 1991). The majority ignores the fact that in North Carolina, "a deputy is authorized to act only in ministerial matters." <u>State v. Corbett</u>, 69 S.E.2d 20, 23 (N.C. 1952) (quoting <u>Styers v. Forsyth County</u>, 194 S.E. 305, 308 (N.C. 1937)); <u>see also Gowens v. Alamance County</u>, 3 S.E.2d 339, 340 (N.C. 1939) (a deputy "is the deputy of the sheriff, one appointed to act ordinarily for the sheriff and not in his own name, person or right . . . . The duties and authority of a deputy sheriff relate only to the ministerial duties imposed by law upon the sheriff."). A "ministerial act" is done "under the authority of a superior [and] involves obedience to instructions, <u>but demands no special discretion,</u>

20

judgment or skill." Black's Law Dictionary 996 (1990) (emphasis added).

The majority also relies upon the fact that "the sheriff can be held liable for the misbehavior of the deputies." Again, the majority over-states North Carolina law. True, some "acts of the deputy are acts of the sheriff" and "[f]or this reason, the sheriff is held liable on his official bond for acts of his deputy." Corbett, 69 S.E.2d at 23. But, this liability is not unlimited. "Under [North Carolina] law a deputy is authorized to act only in ministerial matters, and, in respect of these matters, he acts as vice-principal, or alter ego of the sheriff." Id. (first emphasis added). Therefore, a sheriff is liable when a deputy is "acting in the capacity of deputy sheriff," i.e., performing "ministerial" acts under the authority and supervision of the sheriff, not for any and all acts. Id. at 24.

Thus, the discretion of deputy sheriffs under North Carolina law, and a sheriff's liability for the acts of deputies, is extremely limited. A new sheriff can certainly instruct his deputies on his priorities with the expectation that deputy sheriffs must act pursuant to the sheriff's instructions. If a deputy disobeys, of course, a sheriff may dismiss him for insubordination. But, under North Carolina law a deputy does not have the kind of discretion that allows for wholesale dismissal of each and every deputy on the grounds of political affiliation. Cf. Branti, 445 U.S. at 518-20. Indeed, the deputies here specifically allege -- and there is no evidence to the contrary-- that their "job requirements consisted of performing ministerial law enforcement duties."

A few statistics demonstrate that the majority's holding is both extraordinary and ill advised. As of 1988, 151 commissioned officers were employed in the Buncombe County Sheriff's Office and a total of 4,668 commissioned officers were employed in Sheriff's offices throughout the state. See John Clements, North Carolina Facts 61-271 (1988) (enumerating the commissioned officers for each North Carolina county). The majority holds that each and every one of these deputies is a policymaking employee.* The majority may be correct

_____

* The majority suggests that its holding is limited only to "deputies actually sworn to engage in law enforcement activities on behalf of the

21

that discovery as to the job duties of the plaintiff deputies may reveal that some of them occupy positions for which party membership is a legitimate job qualification. But to make a blanket pronouncement that <u>all</u> North Carolina deputies, regardless of actual job duties, are policymaking employees is to make the <u>Elrod</u>-<u>Branti</u> exception into the rule, and to eviscerate the First Amendment protections those cases guaranteed to government workers like the deputies before us today.

II.

Not only does the majority incorrectly analyze the deputies' <u>Elrod</u>-<u>Branti</u> claim, it also totally ignores the deputies' <u>Pickering</u>-<u>Connick</u> claim.

A.

Unquestionably, the deputies allege a <u>Pickering</u> -<u>Connick</u> claim. In addition to the <u>Elrod</u>-<u>Branti</u> claim that they were "terminated for failing to associate themselves politically with the campaign organization of defendant Medford," the deputies also allege that they "supported opposition candidates in their political campaigns" and "addressed matters of public concern, including the relative qualifications of the candidates for the office of Sheriff." The deputies further allege that this speech took place "during off-duty hours," not at their "place of work" and caused no "disruption within the sheriff's office." In doing so, the deputies allege a claim under <u>Pickering</u> and <u>Connick</u>.

As the Supreme Court explained just last term, when a plaintiff alleges that "a government employer take[s] adverse action on account of an employee or service provider's right of free speech" a court must apply, not the <u>Elrod</u>-<u>Branti</u> analysis, but the <u>Pickering</u>-<u>Connick</u> balancing test. <u>O'Hare Truck Service, Inc. v. City of Northlake</u>, 116 S. Ct. 2353, 2357-58 (1996). <u>See also Joyner v. Lancaster</u>, 815 F.2d 20, 22-23 (4th Cir. 1987) (applying <u>Connick</u> to

_____

Sheriff." But all "commissioned officers" are so "sworn." Thus, the majority's attempted "limitation" only demonstrates our ignorance concerning the plaintiffs' actual job duties, and the sweeping breadth of the majority holding.

22

deputy's claim of unconstitutional dismissal after active campaigning for sheriff's opponent); <u>McBee v. Jim Hogg County, Tex.</u>, 730 F.2d 1009, 1014-1015 (5th Cir. 1984) (en banc) (applying <u>Connick</u> to a claim by deputies fired for actively supporting the opposition sheriff); <u>Jones v. Dodson</u>, 727 F.2d 1329, 1334-36 & n. 6 ("Where the protected activity involves `overt expression of ideas' the more open-ended inquiry prescribed by <u>Pickering</u> and its progeny are required to accomplish the necessary balancing. This is so even where the arguably protected activity involves `political' speech or expression . . . .").

The majority recognizes that the deputies "actively campaign[ed] for [Medford's] opponent." It also recognizes that "[w]hen public employees are subjected to discipline for the content of their speech, courts analyze these claims under the <u>Connick</u>-<u>Pickering</u> line of cases." Yet the majority inexplicably concludes that "[t]he wholesale dismissal of deputies <u>who campaigned for the losing candidate</u> . . . implicates the constitutional analysis of political patronage as developed in the <u>Elrod-Branti</u> line of cases." (emphasis added). That holding is directly contrary to the Supreme Court's directive in <u>O'Hare</u>, <u>i.e.</u>, that the <u>Pickering</u>-<u>Connick</u> balancing test, rather than the <u>Elrod-Branti</u> analysis, is applicable to such claims.

The majority likely refuses to follow <u>O'Hare</u> and acknowledge that the deputies have alleged a <u>Pickering</u>-<u>Connick</u> claim because that claim clearly cannot be dismissed at this stage.

B.

The <u>Pickering</u>-<u>Connick</u> analysis involves a two step process to determine whether a public employee's speech is constitutionally protected. First, we ask whether the employee spoke on a matter of "public concern." <u>Connick</u>, 461 U.S. at 147-48. If so, we balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." <u>Pickering</u>, 391 U.S. at 568.

There can be little question that the deputies have alleged that they engaged in speech involving a matter of public concern. The Supreme

23

Court has long recognized that the protection of speech discussing political candidates is at the core of the First Amendment:

> As Madison observed in 1800, just nine years after ratification of the First Amendment: "Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively."

Harte-Hanks Comm., Inc. v. Connaughton, 491 U.S. 657, 687 (1989) (quoting 4 J. Elliot, Debates on the Federal Constitution 575 (1861)).

"Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order `to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" Buckley v. Valeo, 424 U.S. 1, 14 (1976) (quoting Roth v. United States , 354 U.S. 476, 484 (1957)). Accordingly, the deputies' claim that each of them "exercised his or her rights of free speech" and was terminated "for speaking in favor of the opposition candidates" and "address[ing] matters of public concern, including the relative qualifications of the candidates for the office of sheriff" alleges speech on a matter of public concern squarely within core First Amendment protections.

Because the deputies have thus alleged that they spoke on a matter of public concern the next step is to balance their interests "in commenting upon matters of public concern" against "the interest[s] of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568. In this case, there is nothing to balance against the deputies' rights as citizens to "debate on the qualifications of[the] candidates," which the First Amendment clearly protects. Buckley, 424 U.S. at 14.

The only facts before us at this juncture are those alleged by the deputies in their complaint. There, the deputies assert that their cam-

24

paigning "occurred on their own time . . . did not occur at plaintiffs' place of work [and] did not cause any disruption within the sheriff's department." The complaint further alleges that "each plaintiff was fully prepared, as a professional law enforcement officer, to set aside his or her political opinions and to work loyally and cooperatively with the successful candidate for sheriff." Sheriff Medford has submitted <u>no</u> evidence to counter these allegations. Thus, at this stage, there is <u>no</u> evidence of inefficiency or disruption in the workplace to balance against the deputies' undeniably strong interest in engaging in political speech. <u>Cf. Joyner v. Lancaster</u>, 815 F.2d at 22-24 (in view of evidence that a deputy's campaigning caused "friction" and "pervasive distrust and plummeting morale" and "actual" disruption, we upheld the sheriff's decision to discharge him).

In sum, the deputies allege that Sheriff Medford discharged them as a result of speech on a matter of public concern, and that no countervailing government interest justified their discharge. Sheriff Medford has presented no contrary evidence. It may well be that he has such evidence. It may be that the deputies did not actually participate in the political campaign, or that their campaign activity caused substantial disruption in the sheriff's department. But, at this stage, the Sheriff has produced no such evidence. Accordingly, the deputies have indisputably pled a <u>Pickering</u>-<u>Connick</u> claim -- and the majority errs in dismissing it.

III.

The majority notes that "lower courts have issued conflicting and confusing opinions" under <u>Elrod</u> and <u>Branti</u>. (internal quotation mark omitted). At least some of these inconsistencies can be laid at the feet of courts, like today's majority, that are simply antagonistic to the Supreme Court's <u>Elrod</u>-<u>Branti</u> jurisprudence. Even if inferior courts believe that Supreme Court holdings are ill-advised, they are not at liberty to ignore those holdings.

Time and again, inferior federal courts have sought to circumvent the <u>Elrod</u>-<u>Branti</u> jurisprudence by refusing to apply it to decisions regarding promotions, transfers, or dealings with independent contractors. <u>See</u>, <u>e.g.</u>, <u>O'Hare Truck Service, Inc. v. City of Northlake</u>, 47 F.3d 883 (7th Cir. 1995) (holding <u>Elrod</u>-<u>Branti</u> does not apply to

25

independent contractors); Horn v. Kean, 796 F.2d 668 (3d Cir. 1986) (en banc) (same); Sweeney v. Bond, 669 F.2d 542 (8th Cir. 1982) (same); Rutan v. Republican Party of Illinois, 868 F.2d 943 (7th Cir. 1989) (en banc) (Elrod-Branti does not apply to decisions regarding promotions or transfers). Time and again, the Supreme Court has rejected these limitations on the Elrod-Branti mandate. See Rutan v. Republican Party of Ill., 497 U.S. 62, 74-75 (1990) (overruling view that "promotions, transfers and recalls after layoffs based on political affiliation or support are [not] an infringement on the First Amendment rights of public employees"); O'Hare Truck Svce., Inc. v. City of Northlake, 116 S.Ct. 2353, 2356-57 (overruling view that Elrod-Branti does not apply to dismissals of independent contractors).

Yet, the majority insists upon following those courts that have improperly attempted to limit the Elrod-Branti holding, relying extensively on Upton v. Thompson, 930 F.2d at 1212, an opinion from the same circuit that was reversed in both Rutan and O'Hare, while ignoring more persuasive authority from other circuits. See, e.g., Burns v. County of Cambria, Pa., 971 F.2d 1015, 1023 (3d Cir. 1992) ("[F]iring deputy sheriffs for their political affiliation or activities [does not fall] within the narrow exception for political dismissals recognized in Branti and Elrod."); Dickson v. Quarberg, 844 F.2d 1435, 1442-43 (10th Cir. 1988) (head jailer and special deputy were protected under Branti). In addition to refusing to engage in the proper Elrod-Branti analysis and finding all (more than 4,600 in 1988) North Carolina deputy sheriffs are policymakers, the majority ignores the deputies' potentially meritorious claim under Connick and Pickering. Taken together, these holdings make the hiring, firing, promotion, and transfer decisions of North Carolina sheriffs essentially unreviewable. They also call into question whether the numerous North Carolina state troopers (more than 1,100 in 1988) and police officers (more than 7,900 in 1988) are also "policymakers" who can be dismissed at will by each new political regime. See John Clements, North Carolina Facts 23, 61-271 (1988). Only time will tell the extent that the resulting loss of First Amendment freedoms, let alone the constant turnover and retraining of law enforcement officers, will, in the majority's words, "handicap[ ] and impede[ ] law enforcement" efforts.

Judge Hall, Judge Murnaghan, and Judge Michael join in this dissenting opinion.

26

ERVIN, Circuit Judge, dissenting:

Were I to think it proper to do so, I would agree with the analysis offered by Judge Motz in her dissenting opinion. However, I do not believe we possess appellate jurisdiction to reach the merits. I therefore join neither opinion and write separately to explain why this appeal should be dismissed.

I cannot agree with the majority's determination that we possess jurisdiction to hear this appeal. Ordinarily, appellate jurisdiction is lacking to hear an appeal from an order denying a Rule 12(b)(6) motion to dismiss since such an order is interlocutory in nature. Certain collateral orders are, however, considered "final decisions" within the meaning of 28 U.S.C. § 1291 and are therefore immediately appealable. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546-47 (1949). In Coopers & Lybrand v. Livesay, 437 U.S. 463 (1978), the Supreme Court stated that the "small class" of collateral orders comprise those that "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and [are] effectively unreviewable on appeal from a final judgment." Id. at 468.

In particular, certain denials of absolute and qualified immunity fall within this collateral order doctrine. In Nixon v. Fitzgerald, 457 U.S. 731 (1982), the Court held that an order denying a motion for summary judgment on the basis of absolute immunity was immediately appealable. Id. at 740, 742-43. In doing so, it noted that it had twice before held that "orders denying claims of absolute immunity are appealable under the Cohen criteria." Id. at 742 (citing Helstoski v. Meanor, 442 U.S. 500 (1979); Abney v. United States, 431 U.S. 651 (1977)). Both of these cases, however, arose in the criminal context, Helstoski dealing with a congressman's immunity under the Speech and Debate Clause and Abney dealing with the right not to be exposed to double jeopardy.

In Mitchell v. Forsyth, 472 U.S. 511 (1985), the Court extended the collateral order doctrine to include the denial of qualified immunity raised in a motion for summary judgment. Id. at 517, 524-30. The Mitchell Court stressed that a "major characteristic of the denial or granting of a claim appealable under Cohen's`collateral order' doc-

27

trine is that `unless it can be reviewed before[the proceedings terminate], it never can be reviewed at all.'" Id. at 525 (citations omitted). Immunity is "an entitlement not to stand trial under certain circumstances," id., so that officials are not subjected to burdens of broad-reaching discovery and costs of trial. The Court's entire analysis was couched in terms of appeals from denials of summary judgment because it is that denial that "finally and conclusively determines the defendant's claim of right not to stand trial on the plaintiff's allegations." Id. at 527 (emphasis in original).

Since Mitchell the Court has occasionally discoursed upon immunity claims and the collateral order doctrine in sundry dicta. In Lauro Lines s.r.l. v. Chasser, 490 U.S. 495 (1989), for example, the Court did state the proposition more broadly that "in civil cases, we have held that the denial of a motion to dismiss based upon a claim of absolute immunity from suit is immediately appealable prior to final judgment," id. at 499, but the Court cited only to Nixon and Mitchell, both cases arising from summary judgment orders. More recently, however, the Court has confirmed its reluctance to expand the exceptions of the collateral order doctrine, stressing that the "`narrow' exception should stay that way and never be allowed to swallow the general rule." Digital Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 868 (1994). In dictum leaning the other way, the Court stated that Mitchell and Abney may only be "fairly cited for the proposition that orders denying certain immunities are strong candidates for prompt appeal under § 1291." Id. at 871 (emphasis added). I would construe this language to be far from a categorical rule requiring that any order denying absolute or qualified immunity is an immediately appealable collateral order. Moreover, the Supreme Court has specifically directed courts of appeal "to view claims of a `right not to be tried' with skepticism, if not a jaundiced eye." Id. at 873; cf. Van Cauwenberghe v. Biard, 486 U.S. 517, 524 (1988) ("The critical question, following Mitchell, is whether `the essence' of the claimed right is a right not to stand trial.").

In the last two years, the Supreme Court has twice dealt with qualified immunity claims in federal actions arising from summary judgment postures.* In Johnson v. Jones, 515 U.S. 304 (1995), a

_____

* In the term just completed, the Court did again address the issue of qualified immunity in Johnson v. Fankell, 117 S. Ct. 1800 (1997). That

28

unanimous Court held that the denial of summary judgment on a qualified immunity defense claim was <u>not</u> an immediately appealable order to the extent that the order determined there were genuine issues of fact for trial. In the course of its analysis of the collateral order doctrine, the Court noted two considerations that would clearly counsel against finding the order in the instant case to be immediately appealable. First, interlocutory appeals hazard wasting appellate court resources by presenting "appellate courts with less developed records" or by bringing them "appeals that, had the trial simply proceeded, would have turned out to be unnecessary." <u>Id.</u> at 309 (citations omitted). Clearly, without even an answer having been filed, we face a less-than-developed record. Second, <u>Cohen</u>'s criterion that the matter be collateral to the merits of the action "means that review <u>now</u> is less likely to force the appellate court to consider approximately the same (or a very similar) matter more than once, and also seems less likely to delay trial court proceedings (for, if the matter is truly collateral, those proceedings might continue while the appeal is pending)." <u>Id.</u> at 245 (emphasis in original). Because the immunity defense may be raised later, I believe we would have been presented with the same issue, but more factually developed, later. It is worth pointing out that the Court carefully noted--twice--that <u>Mitchell</u> dealt only with the appealability of an order denying summary judgment. <u>See id.</u> at 311-12.

Two terms ago, the Court appeared to limit <u>Johnson</u>. In <u>Behrens v. Pelletier</u>, 133 L.Ed.2d 773 (1996), the Court held that a denial of summary judgment on a qualified immunity claim, not predicated on a fact-based determination as in <u>Johnson</u>, remained immediately appealable even though an earlier interlocutory appeal had denied the immunity defense. Although an unusual posture, the Court plainly was dealing with a qualified immunity defense in the summary judgment context. While the Court twice declared that <u>Mitchell</u>'s interlocutory appeal rule applied to both denials of qualified immunity at the

_____

case concerned, however, whether defendants in a state-court § 1983 action have a federal right to an interlocutory appeal from a denial of qualified immunity. Although the Court ruled that there was no such federal right, I do not read the opinion as providing any further guidance in dealing with qualified immunity in federal actions.

29

dismissal <u>or</u> summary judgment stage, <u>id.</u> at 784-85, the language in both cases is dicta construing dicta.

In the first instance, the Court stated, "<u>Mitchell</u> clearly establishes that an order rejecting the defense of qualified immunity at <u>either</u> the dismissal stage <u>or</u> the summary judgment stage is a `final' judgment subject to immediate appeal." <u>Behrens</u>, 133 L.Ed.2d at 784 (emphases in original). This comment, however, directly construes the following language from <u>Mitchell</u>:

> Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts.

<u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985) (citation omitted); <u>see</u> <u>Behrens</u>, 133 L.Ed.2d at 784 (quoting this language). The phrase "dismissal before the commencement of discovery" in this context does not mean a Rule 12(b)(6) dismissal before an answer has been filed. Instead, it only means that, in certain circumstances, the defendant may avoid discovery, as, for example, where the defendant pleading immunity moves for judgment on the pleadings pursuant to Rule 12(c) or immediately moves for summary judgment before discovery has commenced. When the above language is read in its full context, it is clear the <u>Mitchell</u> Court did not envision denials of Rule 12(b)(6) motions to be immediately appealable. Thus the sentences before and after the above quoted language state:

> [T]he <u>Harlow</u> [<u>v. Fitzgerald</u>, 457 U.S. 800 (1982)] Court refashioned the qualified immunity doctrine in such a way as to "permit the resolution of many insubstantial claims on <u>summary judgment</u>" and to avoid "subject[ing] government officials either to the costs of trial or to the burdens of broadreaching discovery" in cases where the legal norms the officials are alleged to have violated were not clearly estab-

30

lished at the time. Id. at 817-18. [The above quoted lan-
guage appears here.] Harlow thus recognized an entitlement
not to stand trial or face the other burdens of litigation, con-
ditioned on the resolution of the essentially legal question
whether the conduct of which the plaintiff complains vio-
lated clearly established law.

Mitchell, 472 U.S. at 526 (emphasis added). Mitchell, then, was
emphatically concerned with the summary judgment posture, as was
Harlow. Nowhere does this language imply that a defendant should
be free from the burdens of answering a complaint, nor that if that
tack is taken, and rejected by the district court, that such a defendant
may immediately appeal that denial.

In the second instance, the Behrens Court stated that the proposi-
tion that "there could be no immediate appeal from denial of a motion
to dismiss but only from denial of summary judgment . . . is fore-
closed by Mitchell, which unmistakably envisioned immediate appeal
of `[t]he denial of a defendant's motion for dismissal or summary
judgment on the ground of qualified immunity.'" Behrens, 133
L.Ed.2d at 785 (quoting Mitchell, 472 U.S. at 527) (emphasis in origi-
nal). Again, when this language from Mitchell is read in context, it is
plain that the Mitchell Court was not contemplating immediate
appeals of denials of Rule 12(b)(6) motions. In the same paragraph,
after considering why it is that the district court's decision is "conclu-
sive" within the meaning of the collateral order doctrine, the Mitchell
Court stated that "the court's denial of summary judgment finally and
conclusively determines the defendant's claim of right not to stand
trial on the plaintiff's allegations." Mitchell, 472 U.S. at 527 (first
emphasis added; second emphasis in original).

Thus, in both instances, although the Mitchell Court did slip in the
term "dismissal," whether consciously or inadvertently, Mitchell itself
dealt unequivocally with the denial of summary judgment, and the
entire opinion, in context, was cast in those terms, for the Court was
principally concerned with subjecting defendants to the costs and bur-
dens of going beyond summary judgment and into the next phase of
litigation.

Indeed, as the dissent in Behrens accurately pointed out, Mitchell
was "concerned primarily with preserving defendants' immunity from

31

trial, not discovery," and that is why the Court had never before even suggested that an interlocutory appeal could protect a defendant's "anti-discovery interest." Id. at 792 (Breyer, J., dissenting) (emphasis in original). Given the procedural posture of the case, I would therefore construe Behrens to mean only that any prior adjudication of qualified immunity prior to summary judgment will not necessarily have res judicata or other effect on the law of the case and that courts of appeal therefore cannot refuse to hear, for lack of jurisdiction, interlocutory appeals of denials of qualified immunity at the summary judgment stage.

Despite all this conflicting dicta, the Supreme Court has yet to face squarely the issue of whether the denial of a claim of qualified immunity arising in the context of a Rule 12(b)(6) motion satisfies the Cohen criteria for an appealable collateral order. We have held, however, in a clearly distinguishable Rule 12(b) context, that an order granting a plaintiff's motion to strike a defendant's absolute immunity defense is immediately appealable under Nixon. Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, 865 F.2d 77, 79 (4th Cir. 1989). Obviously, the motion to strike arose after the answer had been filed.

In the instant case, this appeal arose before Medford had ever filed his answer. Immunity is an affirmative defense whose burden of pleading rests with the defendant and which does not go to the existence of a § 1983 cause of action. Gomez v. Toledo, 446 U.S. 635, 640 (1980); see also Siegert v. Gilley, 500 U.S. 226, 231 (1991) ("Qualified immunity is a defense that must be pleaded by a defendant official."). The district court's denial of the motion to dismiss did nothing more than look to the adequacy of the plaintiffs-appellees' complaint to satisfy the Rule 12(b) criteria.

In the context of this particular case, it is crucial to recognize that, were we to dismiss the appeal, Medford will not have been denied his opportunity to assert this defense, for he may do so in his answer. After the pleadings are closed, Medford may then move for judgment on the pleadings pursuant to Rule 12(c) or for summary judgment pursuant to Rule 56 on the basis of his claim of immunity. If that motion is denied, Medford may then appeal, an appeal that would be reviewable under the collateral order doctrine. See Behrens, supra. In

32

fact, it is these possible later bites at the appellate apple on the immunity claim--before the burdens of full discovery and the costs of trial --that demonstrate that the denial of a Rule 12(b)(6) motion to dismiss is <u>not</u> a denial that "finally and conclusively determines the defendant's claim of right not to <u>stand trial</u> on the plaintiff's allegations." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 527 (1985) (emphasis in original). Although our sister circuits have treated denials of Rule 12(b)(6) motions raising immunities as collateral orders, none has actually analyzed, as I do here, whether it possessed jurisdiction to do so. <u>See, e.g.</u>, <u>Hafley v. Lohman</u>, 90 F.3d 264, 266 (8th Cir. 1996); <u>Morin v. Caire</u>, 77 F.3d 116, 119 (5th Cir. 1996); <u>Wilson v. Formigoni</u>, 42 F.3d 1060, 1062 (7th Cir. 1994); <u>Figueroa v. United States</u>, 7 F.3d 1405, 1408 (9th Cir. 1993), <u>cert. denied</u>, 114 S. Ct. 1537 (1994). Nevertheless, because this crucial criterion for determining whether an order is collateral is not satisfied in the Rule 12(b)(6) context, I would conclude that we lack appellate jurisdiction to hear this appeal.

I do not believe that we are obliged to follow the dicta in <u>Behrens</u>. To do so in this instance contravenes our nature as a court of limited jurisdiction. We ought to interpret any dicta that affects our jurisdiction in as narrow a fashion as possible, and we should never reach out to address issues that are not properly before us. I believe that the court, by adopting the <u>Behrens</u> dicta as the rule in this circuit, has violated both of these jurisprudential principles.

That violation is particularly egregious here, for the majority ultimately determines that it need not even reach the issue of whether Medford is entitled to qualified immunity. Majority op. at 15. The majority has invoked a questionable jurisdictional basis only to invoke the equally questionable notion of pendent appellate jurisdiction. <u>See Swint v. Chambers County Comm'n</u>, 514 U.S. 35 (1995). Only by such a doubly tenuous thread is the majority able to review, and reverse, the denial of a Rule 12(b)(6) dismissal motion.

The majority relies on our panel decision in <u>Taylor v. Waters</u>, 81 F.3d 429, 437 (4th Cir. 1996), as grounds upon which to exercise pendent appellate jurisdiction. <u>See</u> Majority op. at 3 n.2. <u>Taylor</u>, however, recognized the limitations of appellate jurisdiction. Although <u>Taylor</u> noted that pendent appellate jurisdiction would exist only if the pen-

33

dent issue were "(1) inextricably intertwined with the decision of the lower court to deny qualified immunity or (2) consideration of the additional issue is necessary to ensure meaningful review of the qualified immunity question," Taylor, 81 F.3d at 437, the Taylor panel concluded that it lacked jurisdiction to review the pendent issues. Taylor, therefore, provides only tangential support, at best, for the exercise of pendent jurisdiction here. Indeed, we have never invoked pendent appellate jurisdiction in the wake of Swint. See Garraghty v. Commonwealth of Va., Dep't of Corrections, 52 F.3d 1274, 1279 n.5 (4th Cir. 1995); Renn v. Garrison, 100 F.3d 344, 352 (4th Cir. 1996). I do not believe we should do so here without a serious analysis of its ramifications, especially since the issue providing the jurisdictional basis on which it is invoked is not even reached.

The majority, for whatever reason, is apparently strongly motivated to reach out and strike down Jones v. Dodson, 727 F.2d 1329 (4th Cir. 1984). To do so it is willing to expand our constitutionally- and congressionally-limited jurisdiction to reverse the denial of a motion to dismiss, before an answer has even been filed. I will not join in this Orwellian perversion of the final judgment rule and our long-established precepts of notice pleading. I, therefore, respectfully dissent.

34