**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KATHY W. KNIGHT,
Plaintiff-Appellant,

v.

C. D. VERNON, individually and in
his official capacity as Sheriff of
Rockingham County; ROCKINGHAM

COUNTY,
Defendants-Appellees.

No. 98-2514

AMERICAN CIVIL LIBERTIES UNION OF
NORTH CAROLINA LEGAL FOUNDATION,
INCORPORATED,
Amicus Curiae.

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
Frank W. Bullock, Jr., District Judge.
(CA-97-755-1)

Argued: September 23, 1999

Decided: June 2, 2000

Before WIDENER and MICHAEL, Circuit Judges, and
Frank J. MAGILL, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

_____

Affirmed in part, reversed in part, and remanded by published opin-
ion. Judge Michael wrote the opinion, in which Senior Judge Magill
joined. Judge Widener wrote a separate opinion, concurring in part
and dissenting in part.

**COUNSEL**

**ARGUED:** Robert Mauldin Elliot, ELLIOT, PISHKO, GELBIN & MORGAN, P.A., Winston-Salem, North Carolina, for Appellant. James Redfern Morgan, Jr., WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Winston-Salem, North Carolina, for Appellees. **ON BRIEF:** Martha A. Geer, PATTERSON, HARKAVY & LAW-RENCE, L.L.P., Raleigh, North Carolina, for Amicus Curiae.

_____

**OPINION**

MICHAEL, Circuit Judge:

This is a political firing case. Kathy Knight, a jailer in Rockingham County, North Carolina, claims the sheriff fired her for political disloyalty. She sued the sheriff (in his individual and official capacities) and the county under 42 U.S.C. § 1983, alleging that her First Amendment and due process rights were violated. The complaint also included claims under the North Carolina Constitution and common law. The district court ruled against Ms. Knight on the federal claims, granting summary judgment to the sheriff and the county. It then dismissed the state law claims, declining to exercise supplemental jurisdiction. We reverse the award of summary judgment to the defendants on the First Amendment claim because political allegiance is not an appropriate job requirement for a jailer. We affirm the award of summary judgment to the county on the federal claims because the sheriff was not acting for the county when he fired Ms. Knight. We also affirm the summary judgment for the sheriff on the federal due process claim because Ms. Knight did not have a property interest in her job. Accordingly, the case is remanded for trial on the First Amendment claim against the sheriff and for reinstatement of the state law claims.

I.

The facts about Ms. Knight's job duties as a jailer are not disputed. The other facts are recited, and some justifiable inferences are drawn, in favor of Ms. Knight, the nonmovant in the summary judgment proceedings. See Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).

2

Sheriffs run the county jails in North Carolina. In September 1989 the Rockingham County Sheriff, C.D. Vernon, hired Kathy Knight as a Jailer I. At the job interview Sheriff Vernon, who was a Democrat, stressed the importance of Ms. Knight's political loyalty to him. The sheriff told her, "When it comes time to vote, make sure you vote for who signs your check." The sheriff added that he "ha[d] ways of finding out" how his employees voted.

As a jailer Ms. Knight did not take an oath of office like a deputy sheriff, who is a sworn law enforcement officer. Nor did Ms. Knight receive the extensive training required for sworn deputies. She did not have a written contract, a fixed term of employment, or civil service job protection. Shortly after beginning her job, she was given a copy of the Rockingham County employee handbook. The handbook included discipline and grievance procedures.

As a jailer Ms. Knight was responsible for the processing, supervision and care, and transportation of inmates. Ms. Knight's processing duties included fingerprinting new inmates, obtaining their personal data (addresses, next of kin, etc.), marking and storing their personal belongings, routing them for physical examinations, and arranging for their initial baths and changes into clean clothing. Ms. Knight's daily supervision and care duties involved monitoring inmates every half hour, distributing and logging their medications and supplies, serving them food, and managing their visitors. Occasionally, Ms. Knight filled in as a cook when help was short in the jail's kitchen. Finally, Ms. Knight assisted in transporting inmates to prisons and medical facilities.

Sheriff Vernon acknowledged that Ms. Knight's position (Jailer I or II) was "the lowest level . . . in the jail." Ms. Knight reported to her shift supervisor, who in turn reported to the assistant chief jailer. The assistant chief jailer answered to the chief jailer, a captain who was responsible for one of three departments in the sheriff's office. In this hierarchy, only the captain (and chief jailer) reported to Sheriff Vernon, and the sheriff dealt with this captain on matters of jail policy and management. Sheriff Vernon admitted that he never met with Ms. Knight to consider any decision about the operation of the jail.

During her time as a jailer Ms. Knight received consistently positive performance evaluations. She was commended on several occasions for her levelheaded responses to emergencies, particularly in one hostage situation. After several years Ms. Knight was promoted to the position of Jailer II. The promotion brought no changes in her job duties, however.*

In the late winter and spring of 1994 Sheriff Vernon ran for reelection in the Democratic primary to be held on May 3rd. His chief opponent was Sam Page, a former deputy and officer in the sheriff's department. In January 1994, just as the primary campaign was beginning, the Greensboro News and Record ran a story charging that money belonging to inmates in the county jail had been mishandled by jail employees. The story, entitled "Jail Workers Used Inmates' Money For Loans," reported that jail employees cashed personal checks from the cash fund (called the "inmate trust fund") held on behalf of inmates. Often, weeks went by before these personal checks were cashed at a bank so that the cash level of the fund could be restored. Jail employees in effect got interest-free loans at the expense

_____

*The record is clear that Ms. Knight was unsworn the entire time she was a jailer. Specifically, Ms. Knight did not take an oath as a law enforcement officer when she was promoted to Jailer II. As she said in her affidavit:

> During my entire employment with the Sheriff's Department and the county, I remained an unsworn jailer. This meant that I never took the training and received the certification to be a sworn deputy. I had asked to go to school, but my request was never granted. Thus, I was never sworn in, and did not have the powers and authority of a sworn law enforcement officer.

Sergeant Reggie King, Ms. Knight's shift supervisor, testified that four jailers (all Jailer IIs) worked under him and three of them, including Ms. Knight, were unsworn. The fourth jailer was sworn in under "grandfather" status because he had worked with a law enforcement office before sworn officers were required to take basic training. In the face of this evidence, we cannot agree with the dissent that Ms. Knight's statement that she was unsworn is "inherently incredible," post at 19, or that Sheriff Vernon was mistaken when he testified that Ms. Knight was not a sworn law enforcement officer, see post at 19 n.1. In any event, the sheriff testified that a Jailer I and Jailer II performed the same duties.

4

of inmates. Sheriff Vernon ordered the practice stopped as soon as he learned of it. Ultimately, the sheriff blamed Ms. Knight for leaking the story to the press. Ms. Knight denied that she was responsible, and her version of what happened follows.

Jail inmates were not allowed to keep more than $20 in their cells. The rest of their money was placed in the cash drawer in the assistant chief jailer's desk, and the amount credited to each inmate was written in a ledger. Ms. Knight knew that her co workers were using the inmate trust fund to cash their personal checks. In October 1993 Ms. Knight saw Sergeant King, her shift supervisor, make copies of the checks and put the copies in his locker. This alarmed Ms. Knight, so she then made copies of the checks for herself "in case something happened." In December 1993 Ms. Knight was present when Page (Vernon's opponent) visited the jail to write a bail bond. At that time Ms. Knight heard Sergeant King tell Page that jail employees were cashing checks on the inmate trust fund. King also showed Page the checks being held in the cash drawer. On her next day off Ms. Knight talked to a friend, magistrate Roger Hair, about the trust fund matter. Hair said that the check cashing practice could be illegal, and he recommended that Ms. Knight warn her supervisor, Sergeant King. Ms. Knight talked with Sergeant King during her next shift, and King brought the matter to Sheriff Vernon's attention without further delay. In addition to putting a stop to the check cashing, Vernon instructed the chief jailer to open a bank account for inmate funds. The sheriff did not begin any investigation of the trust fund matter at that time (December 1993). Indeed, Sheriff Vernon advised the newspaper that no one would be disciplined.

We now return to the primary campaign for sheriff. Throughout the campaign season Sheriff Vernon's top officers used shift meetings to promote his reelection effort. Sheriff's department employees were told, "Remember who you're working for. The man gave you a job." Department employees, including Ms. Knight, were urged to contribute money to Sheriff Vernon's campaign, put his signs in their yards, attend bean dinners and other political meetings, make campaign appearances for the sheriff, and work the polls on election day.

As the campaign dragged on, a rumor circulated in the department that Kathy Knight and her husband (deputy sheriff Bobby Knight)

were supporting Sam Page for sheriff. The rumor was fanned by the fact that the Knights, who were friends with Page, had not demonstrated any open support for Sheriff Vernon. When Bobby Knight learned of the rumor in April 1994, he met with the sheriff. Mr. Knight denied the rumor and told the sheriff that he and his wife were worried about their jobs. Mr. Knight asked what he "needed to do to make it right." The sheriff hinted that Mr. Knight should contribute at least $100 to his campaign. The meeting ended with the sheriff saying that he wanted to see both Mr. Knight and his wife the next day.

The next day, Sheriff Vernon began his meeting with the Knights by accusing Kathy Knight of going to the press with the inmate trust fund problem. Ms. Knight denied this, saying she would take a polygraph examination to prove her truthfulness. The sheriff next accused the Knights of supporting Sam Page. In particular, the sheriff noted that they did not even have a "Vote for Vernon" sign in their yard. The Knights replied that they were neutral in the sheriff's race but that they were supporting Sheriff Vernon by doing good jobs as deputy and jailer. The sheriff's dissatisfaction with this explanation was apparent at once, and Mr. Knight asked him again what he and his wife should do. The sheriff answered that the Knights should "throw [them]selves completely into his campaign." The sheriff mentioned specifically that they should attend "every one" of his campaign functions and put up his posters. As the Knights left the meeting, Sheriff Vernon said that "even if [the Knights] did show some support for him at [that] point, it would not put [them] in his good graces." The Knights were convinced that they would be fired right after the election.

Sheriff Vernon won the Democratic primary on May 3, 1994. Because there was no Republican running for sheriff, his general election victory was all but assured. Three weeks later, the sheriff instructed Detective Jim Kendrick to investigate the leak of the inmate trust fund problem to the news media. The investigation focused on Kathy Knight. Detective Kendrick's report implied that Ms. Knight was complicit in a scheme to bring the trust fund problem to the attention of the press and the public. From the detective's report, Sheriff Vernon concluded that the problem "ended up in the papers" because of Ms. Knight's actions. Vernon fired her on July 15, 1994. (At about the same time the sheriff fired Bobby Knight and five

6

other employees who had not supported him in the primary.) Ms. Knight filed a grievance with Rockingham County, but it was never heard.

Ms. Knight sued Sheriff Vernon and Rockingham County under 42 U.S.C. § 1983, alleging (1) a violation of the First Amendment because she was fired for failing to support the sheriff in the primary and (2) a violation of the Due Process Clause because she was not afforded a hearing. In granting summary judgment to the defendants on Ms. Knight's (First Amendment) political firing claim, the district court relied on Jenkins v. Medford, 119 F.3d 1156, 1164 (4th Cir. 1997) (en banc) (holding that a deputy sheriff is a policymaker who "may be lawfully terminated for political reasons under the Elrod-Branti exception to prohibited political terminations"), cert. denied, 522 U.S. 1090 (1998). Specifically, the district court concluded that "the role of jailer is sufficiently similar to the role of deputy sheriff to bring jailers within the policymaker exception to the Elrod-Branti rule." Knight v. Vernon, 23 F. Supp. 2d 634, 646 (M.D.N.C. 1998). The district court also granted summary judgment to the county on Ms. Knight's § 1983 claim because the sheriff was not exercising authority on behalf of the county (or acting pursuant to a policy of the county) when he fired Ms. Knight. Finally, the court granted the sheriff's motion for summary judgment on Ms. Knight's due process claim under the United States Constitution, holding that she had no property interest in her job as jailer. (Once the district court disposed of the federal claims, it dismissed Ms. Knight's state law claims as a matter of housekeeping.) Ms. Knight appeals.

II.

A.

1.

Ms. Knight first argues that the district court erred when it denied her First Amendment protection for her political beliefs. We agree and hold that a sheriff cannot insist on political loyalty as a job requirement for a county jailer like Ms. Knight.

7

In <u>Jenkins v. Medford</u>, 119 F.3d 1156, 1160 (4th Cir. 1997) (en banc), <u>cert. denied</u>, 522 U.S. 1090 (1998), we emphasized that a public employee's political firing claim must be "analyzed under the reasoning developed" in <u>Elrod v. Burns</u>, 427 U.S. 347 (1976), and <u>Branti v. Finkel</u>, 445 U.S. 507 (1980). The First Amendment, <u>Elrod</u> and <u>Branti</u> make clear, prohibits the firing of public employees "solely for the reason that they were not affiliated with" a particular political party or candidate. <u>Branti</u>, 445 U.S. at 517 (quoting <u>Elrod</u>, 427 U.S. at 350). There is, however, a narrow exception when party affiliation (or political allegiance) constitutes "an acceptable requirement for . . . government employment." <u>Id.</u> Specifically, a public employee may be fired because of her politics <u>if</u> her employer "can demonstrate that party affiliation [or political allegiance] is an appropriate requirement for the effective performance of the public office involved." <u>Id.</u> at 518.

In <u>Jenkins</u> we thrashed out (en banc) whether the <u>Elrod-Branti</u> exception allowed a North Carolina sheriff to fire two deputies because they failed to support him in an election. In deciding whether a deputy sheriff's political allegiance to his sheriff is an appropriate job requirement, we examined the political role of sheriffs, the specific duties of their deputies, and the "relationship between the sheriff and his deputies, as that relationship affects the execution of the sheriff's policies." <u>Jenkins</u>, 119 F.3d at 1161. We began by noting that when sheriffs are elected by popular vote, as they are in North Carolina, they have an obligation to the voters to implement their espoused policies. Next, in examining the duties of deputies and their roles in assisting a sheriff, we canvassed the country generally and looked at North Carolina in particular. As a general matter, we found (1) that deputies play a special role in implementing a sheriff's law enforcement policies, (2) that some deputies are usually included in a sheriff's core group of advisors, (3) that deputies (particularly those on patrol) exercise "significant discretion" in performing their jobs, (4) that a sheriff relies on his deputies to foster public confidence in law enforcement, (5) that a sheriff relies on his deputies to provide him with "truthful and accurate information," which is necessary for the sheriff to fulfill his duties, and (6) that deputies are often the general agents of a sheriff, who is civilly liable for their acts. <u>Id.</u> at 1162-63. Turning to North Carolina, we found that a county sheriff is "an important political figure," with special responsibility for public

8

safety and welfare. Id. at 1163. A North Carolina deputy sheriff in turn "hold[s] an office of special trust and confidence, acting in the name of and with powers coterminous with his principal, the elected sheriff." Id. (quoting N.C. Gen. Stat.§ 17E-1).

Our "examination of the role of deputy sheriffs[led] us to conclude that in North Carolina, the office of deputy sheriff is that of a policy-maker, and that deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is liable." Id. at 1164. We therefore concluded that political allegiance to the sheriff is an appropriate job requirement for a deputy. As a result, we held that"North Carolina deputy sheriffs may be lawfully terminated for political reasons under the Elrod-Branti exception to prohibited political terminations." Id. We were careful, however, to qualify our holding as follows: "We limit dismissals based on today's holding to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff. We issue this limitation to caution sheriffs that courts examine the job duties of the position, and not merely the title, of those dismissed." Id. at 1165 (emphasis added).

The central message of Jenkins is that the specific duties of the public employee's position govern whether political allegiance to her employer is an appropriate job requirement. We turn, then, to Ms. Knight's duties as a jailer, which are undisputed. Sheriff Vernon admitted that she had the "lowest level" position in the county jail. When new inmates arrived, Ms. Knight filled out the paperwork necessary for their admission to the jail. Thereafter, she saw to their needs by feeding them (sometimes even cooking for them), distributing their medicine, and monitoring their personal hygiene. Her guard duties involved checking on each inmate every half hour. Ms. Knight's contact with the public was limited to overseeing visitors to the jail and occasionally transporting inmates to prisons or medical facilities. Her duties did not change after she was promoted from Jailer I to Jailer II.

The responsibilities of a jailer, such as Ms. Knight, are routine and limited in comparison to those of a deputy sheriff, who may be fired for his political affiliation. We noted in Jenkins that a deputy is a sworn law enforcement officer. This means that a deputy has the general power of arrest, a power that may be exercised in North Carolina

9

only by an officer who receives extensive training in the enforcement of criminal law. See N.C. Admin. Code tit. 12, r. 10B.0103(17). A sworn deputy is the sheriff's alter ego: he has "powers coterminous with his principal, the elected sheriff." N.C. Gen. Stat. § 17E-1 (quoted in Jenkins, 119 F.3d at 1163). The authority of a jailer, on the other hand, is much more circumscribed. For example, exercising the power of arrest is not one of the job duties of a jailer. Her duties are simply to supervise and care for inmates in the county jail. See N.C. Gen. Stat. § 153A-224. Her training, which is much more limited than that of a deputy, is concentrated on matters of custodial care and supervision. Compare N.C. Admin. Code tit. 12, r. 10B.0502 with N.C. Admin. Code tit. 12, r. 10B.0601.

Ms. Knight was not out in the county engaging in law enforcement activities on behalf of the sheriff. She was not a confidant of the sheriff, and she did not advise him on policy matters. Nor was she involved in communicating the sheriff's policies or positions to the public. See Jenkins, 119 F.3d at 1164 (noting that "[i]f the position resembles a policymaker, a communicator, or a privy to confidential information, then loyalty to the sheriff is an important requirement for the job") (internal quotation marks omitted). Ms. Knight worked mostly at the jail performing ministerial duties. She was therefore not entrusted with broad discretion. The sheriff did not rely on her for assistance in implementing his law enforcement platform.

For all of the foregoing reasons, we hold that Ms. Knight's political allegiance to Sheriff Vernon was not an appropriate requirement for the performance of her job as jailer. The First Amendment therefore protects her from discharge for failing to support Sheriff Vernon in the primary. Our position, by the way, is in line with the three other circuits that have considered whether political loyalty is an appropriate job requirement for a jailer. See Sowards v. Loudon County, 203 F.3d 426, 430 (6th Cir. 2000) (holding that "[b]ecause political considerations are not appropriate for the position of a jailer . . . the Elrod/Branti exception to the First Amendment rule protecting public employees against politically-based dismissals does not apply"); Dickeson v. Quarberg, 844 F.2d 1435 (10th Cir. 1988) (holding that political affiliation is not a proper job requirement for a head jailer); Terry v. Cook, 866 F.2d 373, 378 (11th Cir. 1989) (noting that positions such as jailer and clerk "traditionally revolve around limited

10

objectives and defined duties and do not require those holding them to function as the alter ego of the sheriff or ensure that the policies and goals of the office are implemented").

In announcing our holding, we are mindful that sheriffs need jailers who are dedicated and competent. But Ms. Knight did not have to support Sheriff Vernon in the primary in order to perform her job as jailer with the requisite dedication and competence. Still, if Sheriff Vernon fired Ms. Knight for inadequate job performance or for some other non-political reason, nothing we say here would invalidate her discharge. We simply reverse the district court's decision that Ms. Knight could be fired because of her politics.

2.

Our dissenting colleague suggests first that Ms. Knight's duties as a jailer "did not differ sufficiently to distinguish her stature from that of the deputy sheriffs at issue in Jenkins[v. Medford]." Post at 16. According to the dissent, a jailer's duties measure up to a deputy's because (1) a jailer "has a certain amount of discretion" in dealing with the custody and care of inmates, (2) she "implement[s] the sheriff's policy with respect to the jail and to inmate treatment," and (3) she "communicates the sheriff's policy regarding . . . prison management" to jail visitors. Post at 17-18. These responsibilities, however, are much more circumscribed than those of a deputy sheriff, and their limited scope prevents a jailer from being transformed into a policymaking official. It is true that a jailer must exercise some judgment and common sense in guarding and caring for inmates. But a jailer does not exercise the "significant discretion" that Jenkins found to be accorded to deputy sheriffs, who "make some decisions that actually create policy." Jenkins, 119 F.3d at 1162 (citation omitted). Here, Ms. Knight was not consulted about jail policy, and she did not make policy. She was completely shut out of Sheriff Vernon's policymaking processes. In addition, Ms. Knight did not have any significant leeway in implementing the sheriff's policies and procedures for running the jail. The policies and procedures were set by her superiors; she simply followed orders. See Sowards, 203 F.3d at 438 (noting that jailers "have no role in the policymaking process of the prison;" rather, "they are supervised by and must follow the directives" of their superiors). Finally, a pledge from Ms. Knight to vote for Vernon was

11

not a necessary requirement for her to be effective in communicating with visitors to the jail. Sheriff Vernon, of course, had the right to expect Ms. Knight to be courteous and careful in dealing with visitors. Nevertheless, Ms. Knight's contact with visitors did not make her a "communicator" who was stripped of First Amendment protection. See Akers v. Caperton, 998 F.2d 220, 224 (4th Cir. 1993) (noting that "contact [with the public] alone does not make an employee a `communicator' within the meaning of Elrod -- a telephone operator, a tour guide at the State Capitol, and a bus driver are all in constant contact with the public -- however, no one would seriously argue that the positions are outside Elrod and Branti's protection"). "Communicators" who lack Elrod/Branti protection are those who perform duties such as speechwriting for a public official or explaining his views to the press. See Branti, 445 U.S. at 518.

The dissent next contends that Ms. Knight was Sheriff Vernon's alter ego because as a jailer she had "the special trust and confidence of the sheriff," N.C. Gen. Stat. § 17E-2(3)(b), and because the sheriff was liable for her conduct. A jailer is not the sheriff's "second self" in the sense that a deputy is. In Jenkins we noted that under North Carolina law a deputy has "powers coterminous with his principal, the elected sheriff." 119 F.3d at 1163 (quoting N.C. Gen. Stat. § 17E-1). A jailer's circumscribed powers, as we have demonstrated, do not begin to approach the broad powers given to a deputy. Moreover, "[w]hile [the sheriff] is civilly liable for jailers' actions, this is not sufficient to characterize them as his alter-ego" for all purposes. See Sowards, 203 F.3d at 438 (internal quotation marks omitted).

Finally, the dissent insists that Ms. Knight must have taken the same oath as a deputy sheriff. The record does not support such a conclusion. However, even if Ms. Knight did take such an oath, it would not change our decision. As we emphasized in Jenkins, we "examine the job duties of the position," 119 F.3d at 1165, and Ms. Knight's duties as a jailer were essentially custodial. She simply lacked the special status of a deputy sheriff, who is empowered to stand in for the sheriff on a broad front. According to the Supreme Court, "the question is whether the hiring authority can demonstrate that [political loyalty] is an appropriate requirement for the effective performance of the public office involved." Branti, 445 U.S. at 518. Sheriff Vernon

12

failed to meet this burden. Again, Ms. Knight could do an effective job as a jailer without supporting the sheriff in the primary.

B.

Sheriff Vernon and Rockingham County argue that even if Ms. Knight was in a protected position, she did not proffer sufficient evidence on summary judgment to show that she was fired for political reasons. We disagree.

Ms. Knight proffered the following specific facts. See Fed. R. Civ. P. 56(e). Sheriff Vernon asked for Ms. Knight's political loyalty when he hired her. During the 1994 primary campaign the sheriff's top officers used shift meetings to solicit department employees for campaign contributions for the sheriff and to prod them to work in his campaign. Later in the campaign Sheriff Vernon demanded a meeting with Ms. Knight and her husband (a deputy) and accused them of supporting his opponent. The sheriff urged the Knights to throw themselves into his campaign, but he hinted darkly at the end of the meeting that there was little they could do to get back in his good graces.

Within a month after the May 1994 primary Sheriff Vernon ordered an investigation into press leaks about jail employee abuses of the inmate trust fund. The investigation was launched even though the sheriff had indicated before the election that the matter was closed and that no one would be disciplined. The investigation did not focus on those who misused (or permitted the misuse of) the trust fund. Rather, it focused on those (Ms. Knight and one other person) whom the sheriff believed were responsible for exposing the scheme to the public during the campaign. Ms. Knight was fired on July 15, 1994, at the conclusion of the investigation. The sheriff claims that Ms. Knight was fired because she "routed information" about the trust fund scandal to the newspaper. A reasonable jury, however, could conclude from these facts that the trust fund investigation was a pretext for firing Ms. Knight and that the real reason for her discharge was her failure to support the sheriff in the primary. See Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986). We therefore remand for a trial on Ms. Knight's First Amendment claim that she was fired for political reasons. (Because we affirm the award of summary judgment

13

for the county on a different ground, see below, the trial on this claim will proceed only against Sheriff Vernon.)

III.

Ms. Knight next argues that the district court erred in granting summary judgment to Rockingham County on her § 1983 claims because Sheriff Vernon, and not the county, had the "final policymaking authority" to fire her. We agree with the district court and affirm on this issue.

Rockingham County may be held liable under 42 U.S.C.§ 1983 if Sheriff Vernon's action in firing Ms. Knight represented official county policy. See McMillian v. Monroe County , 520 U.S. 781, 783-85 (1997); Monell v. Department of Social Servs. , 436 U.S. 658, 694 (1978). In determining whether the county is liable for the sheriff's action, we review how state law allocates power and responsibility. See McMillian, 520 U.S. at 786; Dotson v. Chester, 937 F.2d 920, 924 (4th Cir. 1991). We focus our inquiry on the particular policy area in question, here personnel policy. See McMillian , 520 U.S. at 785.

North Carolina law vests the sheriff, not the county, with authority over the personnel decisions of his office. Although the county board of commissioners may fix the number of salaried employees within the sheriff's office, the sheriff "has the exclusive right" under N.C. Gen. Stat. § 153A-103 (1998) "to hire, discharge, and supervise the employees in his office." North Carolina courts interpret this statute to preclude county liability for personnel decisions made by sheriffs. For example, the Court of Appeals of North Carolina, in applying § 153A-103, has held that a sheriff's dispatcher is not an employee of the county and that the county is not liable for the dispatcher's discharge. See Peele v. Provident Mut. Life Ins. Co., 368 S.E.2d 892, 894 (N.C. App.), appeal dismissed, review denied by 373 S.E.2d 547 (N.C. 1988). The Peele court concluded that§ 153A-103 "gives every indication that the control of the employees hired by the sheriff is vested exclusively in the sheriff." Id. See also Spencer v. Byrd, 899 F. Supp. 1439, 1442 (M.D.N.C. 1995) (citing Peele and holding that a sheriff's deputy in North Carolina cannot bring a breach of contract claim against a county because the sheriff, not the county, has control over the deputy); Clark v. Burke County, 450 S.E.2d 747, 749 (N.C.

14

App. 1994) (relying on Peele to hold that "any injury resulting from [the deputy sheriff's] actions in this case cannot result in liability for Burke County and summary judgment is therefore affirmed for Burke County"). Because Sheriff Vernon, and not Rockingham County, had exclusive responsibility for discharging Ms. Knight, the district court properly granted summary judgment for the county on the § 1983 claims.

IV.

Last, Ms. Knight argues that the district court erred in granting summary judgment to Sheriff Vernon on her claim that she was denied procedural due process in violation of the United States Constitution when she was fired without a hearing. Ms. Knight maintains that the county's employee handbook, which contains grievance procedures, gave her a property interest in her job, thus entitling her to procedural due process. Again, we look to state law to determine whether she had a property interest in her job. See Pittman v. Wilson County, 839 F.2d 225, 227 (4th Cir. 1988) (quoting Bishop v. Wood, 426 U.S. 341, 344 (1976)). North Carolina is an at-will employment state. See Kurtzman v. Applied Analytical Indus., Inc., 493 S.E.2d 420, 422 (N.C. 1997), reh'g denied, 502 S.E.2d 594 (N.C. 1998). Thus, in North Carolina "an employer's personnel manual or policies are not part of an employee's contract of employment unless expressly included in that contract." Soles v. City of Raleigh Civil Serv. Comm'n, 480 S.E.2d 685, 687 (N.C. 1997). Because Ms. Knight does not contend that the employee handbook was expressly incorporated into any employment contract, the handbook did not give her a property interest in her job. See id. at 688; see also Jackson v. Long, 102 F.3d 722, 728-30 (4th Cir. 1996) (concluding that North Carolina jailers "have no property right in continued employment"). Finally, because the handbook's grievance procedures were not enacted as a county ordinance, Ms. Knight's case is distinguishable from other cases that recognize a property interest when a personnel policy has been codified as an ordinance. See, e.g., Paschal v. Myers, 497 S.E.2d 311, 315 (N.C. App. 1998); cf. Wuchte v. McNeil , 505 S.E.2d 142, 145 (N.C. App. 1998) (noting the difference between ordinances and unilaterally promulgated policies). The district court was correct to conclude that the handbook did not give Ms. Knight a protectable

15

property interest in her job, and the court properly awarded summary judgment to the sheriff on the federal due process claim.

V.

In sum, we hold that political allegiance is not an appropriate job requirement for a jailer, and we reverse the district court's determination to the contrary. We therefore remand for a trial on Ms. Knight's claim against Sheriff Vernon (in his individual and official capacities) that he fired her for political reasons in violation of the First Amendment. We affirm the district court's grant of summary judgment to Rockingham County on the two § 1983 claims and to Sheriff Vernon on the § 1983 due process claim. Because Ms. Knight's First Amendment claim against the sheriff survives, her state law claims should be reinstated for further proceedings.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

WIDENER, Circuit Judge, concurring and dissenting:

I concur in parts III and IV of the majority opinion, but to the rest of the opinion, I must respectfully dissent.

I.

The majority bases its decision on the limiting of the decision in Jenkins v. Medford, 119 F.3d 1156, 1165 (4th Cir. 1997) (en banc), to sworn law enforcement deputies for the purpose of determining whether those deputies might have been fired for political reasons under Elrod v. Burns, 427 U.S. 347, 367 (1976), and on its finding that Mrs. Knight's activities as a detention officer in North Carolina were primarily ministerial. I believe the district court properly determined that Mrs. Knight's duties as a detention officer did not differ sufficiently to distinguish her stature from that of the deputy sheriffs at issue in Jenkins. I do not agree with the majority's technical distinctions between the position of detention officer and deputy sheriff; indeed, on the facts of this case there are none of consequence.

16

In Jenkins, we found several characteristics important in our determination that deputy sheriffs are policymakers. We noted that deputy sheriffs are the alter egos of the sheriff; therefore, the sheriff is liable for the deputy's actions. Jenkins, 119 F.3d at 1164. We also found that deputy sheriffs exercised discretion in determining how to complete their law enforcement duties. Jenkins, 119 F.3d at 1165. Deputy sheriffs foster public confidence in law enforcement and make decisions that create policy. Jenkins, 119 F.3d at 1162. In sum, we acknowledged that persons hired as policymakers and persons privy to private information can be fired for political reasons. Jenkins, 119 F.3d at 1164.

In North Carolina, one of the sheriff's principal statutory duties is the care and custody of the jail. N.C. Gen. Stat.§ 162-22. The North Carolina Administrative Code defines a detention officer as a "person performing responsibilities . . . which include but are not limited to the control, care, and supervision of any inmates incarcerated in the county jail . . . under the direct supervision and management of the sheriff." N.C. Admin. Code tit. 12, r. 10B.0103. Under North Carolina law, detention officers are the alter egos of the sheriff; therefore, the sheriff is liable for the detention officers' actions. See Sutton v. Williams, 155 S.E. 160 (N.C. 1930); Davis v. Moore, 2 S.E.2d 366 (N.C. 1939); Dunn v. Swanson, 7 S.E.2d 563 (N.C. 1940). Detention officers are engaged in law enforcement activities concerning the supervision of inmates. See N.C. Gen. Stat. § 153A. North Carolina law also considers both deputy sheriffs and detention officers to be justice officers. N.C. Gen. Stat. § 17E-2(3)(a) & (b).

The detention officer manages inmates and those who visit them. Through this contact, she communicates the sheriff's policy regarding inmates and prison management, not unlike the way deputy sheriffs communicate the sheriff's law enforcement policy with the members of the public they deal with in doing their duty. Even if some detention officers do not have the power to arrest in public like sworn deputies, Gowens v. Alamance County, 3 S.E.2d 339, 341 (N.C. 1939), detention officers are vested with a certain amount of discretion in that they must be able to address custody, care, medical, and other decisions respecting the inmates in their custody. See N.C. Gen. Stat. § 153A-224. A detention officer may not necessarily be a confidant of the sheriff himself, but she may be privy to confidential informa-

17

tion, and the detention officer does implement the sheriff's policy with respect to the jail and to inmate treatment.

I agree with the district court that these duties, which the district court recounted in greater detail, essentially comport with those we found important in <u>Jenkins</u>. A detention officer performs more than mere ministerial functions, and I believe that any differences between the positions of deputy and detention officer are distinctions without difference.

II.

A.

It is easily demonstrated that Mrs. Knight was the alter ego of Vernon, the sheriff.

A North Carolina statute provides:

> The sheriff shall have the care and custody of the jail in his county; and shall be, or appoint, the keeper thereof. . . .

N.C. Gen. Stat. § 162-22. Another North Carolina statute provides:

> <u>The sheriff may not delegate to another person</u> the final responsibility for discharging his official duties, but he may appoint a deputy or employ others to assist him in performing his official duties. (italics added)

N.C. Gen. Stat. § 162-24.

Mrs. Knight was a Justice Officer under North Carolina law. A Justice Officer is:

> <u>a person who, through the special trust and confidence of the sheriff</u>, has been appointed as a detention officer by the sheriff. (italics added)

N.C. Gen. Stat. § 17E-2(3)(6).

18

Thus, Mrs. Knight was a Justice Officer in whom the sheriff imposed "special trust and confidence" and for whom the sheriff was liable under North Carolina statutory law without even the necessity of referring to court decisions, but which court decisions are consistent with this conclusion.

B.

The North Carolina Supreme Court has reasoned that a jailer is a "law enforcement officer." State v. Dix , 193 S.E.2d. 897, 904 (N.C. 1973). And the district court has found without refutation that a Jailer II is a sworn law enforcement officer.

It is admitted by Mrs. Knight that she was promoted from Jailer I to Jailer II. See Br. p.2, A.30, A.393. And, as noted, the district court found without refutation that a Jailer II is a sworn law enforcement officer. A.393. That fact is corroborated by the position Mrs. Knight takes in her brief, and the majority takes in this opinion, that she supports her case as to liability by her claim that she was not sworn and had not taken the proper training. Mrs. Knight, however, undoubtedly accepted the greater pay and emoluments of the office, and it is more than unbecoming, even impermissible, for her to accept the pay of the office but not the disabilities attending it. Official acts are presumed to have been done in a regular manner, see e.g. Nofire v. United States, 164 U.S. 657, 660-61 (1897), and I find her statement that she was not qualified for, or sworn to, the office she held and the salary she received to border on the inherently incredible. Certainly it is not enough to upset a summary judgment or to accept as a fact.[1]

Indeed, even a casual reference to the statutes of North Carolina shows that N.C. Gen. Stat. § 11-11 sets out the oaths, 29 in all, for every officer of North Carolina which "shall be in the words follow-

_____

[1] In his deposition, Sheriff Vernon testified that Mrs. Knight was not a sworn law enforcement officer. However, it appears that this testimony was based on his mistaken belief that Mrs. Knight was employed as a Jailer I and not employed as a Jailer II in 1994. Mrs. Knight's employment evaluations reveal that she held the position of a Jailer II since at least 1992.

ing the names[2] of said persons respectively." Among them are the oaths to be administered, for Sheriff, to the "office of sheriff of _____ county," and the separate oath of a "Law Enforcement Officer." The only other of those 29 oaths which could apply to Mrs. Knight is the one styled "General Oath" which is given when "the term[3] of whose oath is not given above" in the 28 previous oaths.

Because the Supreme Court of North Carolina has reasoned that a jailer is a law enforcement officer, and because that is the only oath among the 29 which is applicable to her, Mrs. Knight is bound to have been required to take the oath of a "Law Enforcement Officer" under N.C. Gen. Stat. § 11-11. That is the same oath taken by a deputy sheriff, and it obligates her to "be alert and vigilant to enforce the criminal laws of this State."

I am of opinion that this case should be disposed of on the reasoning of Regan v. Boogertman, 984 F.2d 577, 580 (2d Cir. 1993):

> There is no likely circumstance in which a shared ideology is more important than when an elected official appoints a deputy who may act in his or her stead. Elected officials are charged with carrying forth the mandate of the voting public, and in order to effectuate the policies promised the electorate, that official must be able to have trusted advisors and alternates who are directly accountable to that official.

To reach the conclusion of the majority under North Carolina law, it would be necessary to find that Mrs. Knight was not a law enforcement officer, which is patently not possible.

III.

Whatever factual differences I may have with the majority, or whatever different conclusion I may draw from the same facts, should not cloud or obscure the fact that under three North Carolina statutes and a decision of the North Carolina Supreme Court, Mrs. Knight was

_____

2 "Names" refers to the name of the office.

3 "Term" refers to the name of the office.

20

not the type of employee entitled to Constitutional protection because of her political affiliation and loyalties. N.C. Gen. Stat. § 162-22 provides that:

> The sheriff shall have the care and custody of the jail in his county; and shall be, or appoint, the keeper thereof. . . .

N.C. Gen. Stat. § 162-24 provides that:

> The sheriff may not delegate to an other person the final responsibility for discharging his official duties, but he may appoint a deputy or employ others to assist him in performing his official duties.

N.C. Gen. Stat. § 17E-2(3)(b) provides that a justice officer is:

> A person who, through the special trust and confidence of the sheriff, has been appointed as a detention officer by the sheriff . . . .

Mrs. Knight was a justice officer.

The North Carolina Supreme Court has decided that a jailer is a "law enforcement officer" in State v. Dix , 193 S.E.2d 897, 904 (N.C. 1973).

Even on the facts of this case, acknowledged by the majority, these statutes and the Dix decision alone justify the conclusion of the district court.

In sum, I would affirm.

21