ELLEN LIPTON HOLLANDER, District Judge,
concurring in part and dissenting in part:
I concur in Chief Judge Trader’s excellent opinion, with one exception. The majority concludes that, at the relevant time, “a reasonable sheriff could have believed he had the right to choose not to reappoint his sworn deputies for political reasons,” Maj. Op. at 391, and, on this basis, it determines that Sheriff Roberts is protected by qualified immunity with respect to his discharge of Carter, Dixon, and McCoy. In my view, when these deputies were discharged in December 2009, the law was clearly established that a sheriffs deputy with the job duties of a jailer could not be fired on the basis of political affiliation. Therefore, I respectfully disagree with the majority’s ruling as to qualified immunity.
In general, “the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments.” El-rod v. Bums, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality); see Branti v. Finkel, 445 U.S. 507, 516-17,100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (recognizing, generally, that “the First Amendment prohibits the dismissal of a public employee solely because of his private political beliefs”). Based on what is known as the Elrod-Branti doctrine, “public employees who allege that they were discharged ... solely because of their partisan political affiliation or nonaffiliation state a claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments.” Elrod, 427 U.S. at 349, 96 S.Ct. 2673. This case concerns the scope of “a narrow exception” to that baseline rule, Maj. Op. at 374, which frames the qualified immunity analysis.
Pursuant to the exception to the Elrod-Branti doctrine, dismissal based on political affiliation is lawful if “the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.” Branti, 445 U.S. at 518, 100 S.Ct. 1287. The Supreme Court’s formulation of the doctrine clearly puts the onus on the employer to establish that a particular employee comes within the exception to the rule barring discharge of a public employee based on political affiliation. The majority correctly concludes that, in the light most favorable to plaintiffs, they were dismissed in violation of their rights under the First Amendment.[1] This, in turn, requires consideration of Sheriff Roberts’ defense of qualified immunity.
“Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The qualified immunity analysis involves two inquiries: first, whether the facts alleged, “[t]aken in the light most favorable to the party asserting the injury, *396 ... show the officer’s conduct violated a constitutional [or statutory] right,” Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); and second, whether the right at issue “ ‘was clearly established in the specific context of the case — that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.’ ” Merchant v. Bauer, 677 F.3d 656, 662 (4th Cir.) (citation omitted), cert, denied, — U.S. -, 133 S.Ct. 789, 184 L.Ed.2d 582 (2012). The “two inquiries ... may be assessed in either sequence.” Id. at 661-62.
“To be clearly established, a right must be sufficiently clear ‘that every reasonable official would [have understood] that what he is doing violates that right.’ In other words, ‘existing precedent must have placed the statutory or constitutional question beyond debate.’ ” Reichle v. Howards, — U.S. -, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (quoting Ashcroft v. al-Kidd, 563 U.S.-, 131 S.Ct. 2074, 2078, 2083, 179 L.Ed.2d 1149 (2011)) (some internal quotation marks and citations omitted). The issue is “assessed in light of the legal rules that were ‘clearly established’ at the time” of the disputed conduct. Messerschmidt v. Millender, — U.S. -, 132 S.Ct. 1235,1245, 182 L.Ed.2d 47 (2012) (citation and some internal quotation marks omitted). Accordingly, we must consider the state of the law in December 2009, when Sheriff Roberts discharged Carter, Dixon, and McCoy.
As to the first prong of the inquiry, which evaluates the merits of the claim of constitutional violation, the majority determines that, in the light most favorable to plaintiffs, Sheriff Roberts improperly dismissed them. In reaching that conclusion, the majority engages in a careful analysis of Jenkins v. Medford, 119 F.3d 1156 (4th Cir.1997) (en banc), cert, denied, 522 U.S. 1090, 118 S.Ct. 881, 139 L.Ed.2d 869 (1998), and Knight v. Vernon, 214 F.3d 544 (4th Cir.2000). In my view, these same cases are dispositive as to the second prong of the qualified immunity inquiry. Jenkins and Knight clearly established that the Elrod-Branti doctrine requires consideration of a deputy’s actual job responsibilities, rather than the title of the position.
The Supreme Court’s formulation of the doctrine, of course, is paramount. In El-rod, a newly elected Democratic sheriff discharged several Republican employees of the Sheriffs Office “solely because they did not support and were not members of the Democratic Party....” 427 U.S. at 350-51, 96 S.Ct. 2673. One of the discharged employees was “Chief Deputy of the Process Division and supervised all departments of the Sheriffs Office” at a certain location; another employee was a courthouse “bailiff and security guard”; a third employee was a process server in the office. Id. On First Amendment grounds, the employees sued in federal court to enjoin their termination. Three justices of the Supreme Court, joined by two concurring justices, held that the district court should have granted the injunction. See id. at 373, 96 S.Ct. 2673. The three-justice plurality opined that “the practice of patronage dismissals is unconstitutional” because “any contribution of patronage dismissals to the democratic process does not suffice to override their severe encroachment on First Amendment freedoms.” Id. at 373, 96 S.Ct. 2673.
The two concurring justices articulated an exception to that general principle, viewing the case as presenting only a “single substantive question”: “whether a non-policymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the *397 sole ground of his political beliefs.” Id. at 375, 96 S.Ct. 2673 (Stewart, J., concurring) (emphasis added).[2] The concurring justices “agree[d] with the plurality” that such an employee could not be dismissed on the basis of political affiliation. Id.
Four years later, in Branti, supra, 445 U.S. 507, 100 S.Ct. 1287, a majority of the Court reaffirmed Elrod’s holding, in the context of the imminent firing of two Republican assistant public defenders by a Democratic public defender. See id. at 508-09, 100 S.Ct. 1287. In so doing, the Branti Court reformulated the Elrod concurrence’s exception to the prohibition of dismissals on the basis of political affiliation for “policymaking” or “confidential” employees. The Branti Court said: “[T]he ultimate inquiry is not whether the label ‘policymaker’ or ‘confidential’ fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.” Id. at 518, 100 S.Ct. 1287. It concluded that the assistant public defenders did not fall into the exception to the general rule barring termination on the basis of political affiliation, even though, in some respects, they were involved in policymaking or privy to confidential information. Id. at 519-20, 100 S.Ct. 1287.[3]
Consistent with Elrod and Branti, this circuit’s case law has long required courts to “ ‘examine the particular responsibilities of the position’ ” to determine whether a given public employee comes within the exception to the rule against patronage dismissals. Maj. Op. at 375 (quoting Stott v. Haworth, 916 F.2d 134, 142 (4th Cir. 1990)). In Stott, the court articulated a two-part test to guide the analysis. The first part requires examination of “ ‘whether the position at issue, no matter how policy-influencing or confidential it may be, relates to partisan political interests ... [or] concerns.’ ” Stott, 916 F.2d at 141 (citations and some internal quotation marks omitted). If the position does “ ‘involve government decision-making on issues where there is room for political disagreement on goals or their implementation,’ ” the second “ ‘step is to examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement.’ ” Id. at 141-42 (citation omitted). The court recognized political affiliation as an appropriate job requirement “ ‘when there is a rational connection between shared ideology and job performance.’ ” Id. at 142 (citation omitted).
This circuit’s Elrod-Branti case law has continued to adhere to Stott’s focus on the job responsibilities of a given position. See, e.g., Fields v. Prater, 566 F.3d 381, 386-87 (4th Cir.2009) (applying Stott analysis); Nader v. Blair, 549 F.3d 953, 959-62 (4th Cir.2008) (same). Commenting on the test endorsed by Stott, the court said in Jen *398 kins, 119 F.3d at 1162: “Our cases have moved ... to position-specific analyses.”
The majority’s conclusion that, at the relevant time, the law as to deputy sheriffs was not clearly established is based largely on its belief that Jenkins sent “very mixed signals” as to the status of a sheriffs deputy under the Elrod-Branti doctrine. Maj. Op. at 391. Jenkins, which involved the termination of ten North Carolina sheriffs deputies, contains instances in which the court used broad language that, according to the majority here, arguably suggested that a Sheriff could terminate a deputy for political reasons, without regard to actual duties. Id. But, the Jenkins majority took pains to define the scope of its holding and to resolve any “tension” created by its language. Id. at 391-92.
The Jenkins majority stated that, “in North Carolina, the office of deputy sheriff is that of a policymaker, and ... deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is liable,” and concluded from this “that such North Carolina deputy sheriffs may be lawfully terminated for political reasons under the Elrod-Branti exception to prohibited political terminations.” Jenkins, 119 F.3d at 1164. The Jenkins majority also said: “We hold that newly elected or reelected sheriffs may dismiss deputies either because of party affiliation or campaign activity.” Id.
These statements cannot be read in isolation, however. The Jenkins majority was engaged in overruling the court’s earlier decision in Jones v. Dodson, 727 F.2d 1329 (4th Cir.1984), which had held that deputy sheriffs could not be fired on the basis of political affiliation, “no matter what the size of the office, or the specific position of power involved, or the customary intimacy of the associations within the office, or the undoubted need for mutual trust and confidence within any law enforcement agency.” Id. at 1338. The Jenkins Court announced, 119 F.3d at 1164: “We disagree with Dodson to the extent it suggests that no deputy sheriff can ever be a policymaker.”
The dissent in Jenkins maintained that the majority “refus[ed] to engage in the proper Elrodr-Branti analysis.... ” Id. at 1171 (Motz, J., dissenting). Pointing to the broad, categorical language employed by the Jenkins majority, the dissent reasoned that the majority had found that “all (more than 4,600 in 1988) North Carolina deputy sheriffs are policymakers,” thereby “call[ing] into question whether the numerous North Carolina state troopers (more than 1,100 in 1988) and police officers (more than 7,900 in 1988) are also ‘policymakers’ who can be dismissed at will by each new political regime.” Id. (emphasis in original).
In response, the Jenkins majority expressly rejected the dissent’s construction of its holding, explaining that its holding was “limit[ed]” to “those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff.” Id. at 1165 (emphasis added). Further, the Jenkins majority insisted that its holding “applies only to those who meet the requirements of the rule as we state it,” id. at 1165 n. 66, and did “not extend to all 13,600 officers in North Carolina, as the dissent suggests.” Id. It reasoned that the “deputies in the instant case” fell within the Elrod-Branti exception “[bjecause” they were “law enforcement officers.” Id. at 1165 (emphasis added).
Of import here, the Jenkins majority directed that “the district courts are to engage in a Stott-type analysis, examining the specific position at issue.... ” Id. at 1164 (emphasis added). Moreover, the Jenkins majority directly admonished sheriffs within the Fourth Circuit, stating: “We issue this limitation to caution sheriffs that courts examine the job duties of the position, and not merely the title, of *399 those dismissed.” Id. at 1165 (emphasis added). This directive is particularly salient, given that qualified immunity is predicated on the notion that “a reasonably competent public official should know the law governing his conduct.” Harlow v. Fitzgerald, 457 U.S. 800, 818-19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); accord Tru-lock v. Freeh, 275 F.3d 391, 400 (4th Cir. 2001), cert, denied, 537 U.S. 1045,123 S.Ct. 621,154 L.Ed.2d 517 (2002).
Notably, the majority here acknowledges “the Jenkins majority’s specific rejection of the dissent’s characterization of its analysis.” Maj. Op. at 393. But, even assuming that Jenkins left the state of circuit precedent unclear as to the application of the Elrod-Branti doctrine to deputy sheriffs, the court’s subsequent decision in Knight v. Vernon, supra, 214 F.3d 544, laid to rest any ambiguity with respect to sheriffs deputies serving as jailers.
In Knight, the district court had relied on Jenkins in granting summary judgment to a sheriff who fired a jailer, based on the district court’s conclusion that the role of a jailer is similar to the role of a deputy. See Knight v. Vernon, 23 F.Supp.2d 634, 646 (M.D.N.C.1998), rev’d in part, ajfd in part on other grounds, 214 F.3d 544 (4th Cir.2000). This court disagreed, thereby clarifying any possible confusion as to the proper construction of Jenkins.
The court expressly held that “a sheriff cannot insist on political loyalty as a job requirement for a county jailer214 F.3d at 548. It reasoned that “political allegiance to [the sheriff] was not an appropriate requirement for the performance of [the] job [of] jailer,” id. at 550, and this would be so even if the jailer had taken the oath of a deputy sheriff. Id. at 551.[4] In its analysis, the majority reiterated that the “central message of Jenkins is that the specific duties of the public employee’s position govern whether political allegiance to her employer is an appropriate job requirement.” Id. at 549 (emphasis added).
Focusing on the particular job duties of a jailer, the Knight majority emphasized the “circumscribed,” “routine,” and “limited” responsibilities of the position, in contrast to those of a sheriffs deputy with “the general power of arrest.” Id. at 550. It noted that “exercising the power of arrest is not one of the job duties of a jailer. Her duties are simply to supervise and care for inmates in the county jail.” Id. The Knight majority also observed: “Ms. Knight was not out in the county engaging in law enforcement activities on behalf of the sheriff. She was not a confidant of the sheriff, and she did not advise him on policy matters. Nor was she involved in communicating the sheriffs policies or positions to the public.” Id.
In its analysis of the merits, the majority here acknowledges that the job duties of Carter, McCoy, and Dixon were “essentially identical to those of the plaintiff in Knight v. Vernon.” Maj. Op. at 377-78. It goes on to say, in the context of their termination, that “the near identity between the duties of the deputy plaintiffs in this case and Knight’s duties warrants the same result here.” Id. at 378. I readily agree with the majority that there is no cognizable distinction for purposes of the Elrod-Branti doctrine between the jailer in Knight and the jailers in this case, As I see it, that should end the qualified immunity inquiry.
To be sure, the jailers here were sworn deputy sheriffs. But, they did not exercise *400 law enforcement responsibilities (or, at least, have raised a genuine factual dispute as to whether they did). The district court asserted that, because the “officers in this case were sworn, uniformed deputies,” they had “the power of arrest.” Bland v. Roberts, 857 F.Supp.2d 599, 609 (E.D.Va. 2012). But, as the majority observes, see Maj. Op. at 379, the deputies here could not lawfully exercise the arrest power, except in extraordinary circumstances, because they had been trained as jailers rather than as law enforcement officers, and the arrest power was not an appreciable aspect of their duties. Indeed, the undisputed record evidence is that no deputy in the Sheriffs Department had made an arrest in the preceding sixteen years.
Moreover, as the majority points out, the record is clear that, although the jailers in this case took an oath, they did not take a law enforcement officer’s oath. See Maj. Op. at 378-79. This renders the finding of qualified immunity weaker still, because the Knight Court concluded that even a jailer who does take a law enforcement officer’s oath cannot be discharged on the basis of political affiliation. See Knight, 214 F.3d at 551.
In contrasting the role of a “jailer” with that of a “deputy sheriff, who may be fired for his political affiliation,” id. at 550, the Knight Court was referring to the type of deputy discussed “in Jenkins a deputy who “is a sworn law enforcement officer” and who “has the general power of arrest, a power that may be exercised in North Carolina [and Virginia] only by an officer who receives extensive training in the enforcement of criminal law.” Id. A reasonable sheriff reading Knight would realize that such a description of a “deputy” did not encompass Carter, McCoy, and Dixon, who served as jailers, and would have heeded the court’s warning in both Knight and Jenkins that “ ‘courts examine the job duties of the position, and not merely the title, of those dismissed.’” Knight, 214 F.3d at 549 (quoting Jenkins, 119 F.3d at 1165) (emphasis in Knight).
In support of its view that the pertinent law was not clearly established when plaintiffs were discharged in December 2009, the majority places unwarranted emphasis on Pike v. Osborne, 301 F.3d 182 (4th Cir.2002). In that case, the court held that a sheriff was entitled to qualified immunity in connection with the termination in 1999 (i.e., before Knight was decided) of two dispatchers, based on their political affiliation. In a concurrence, one member of the panel concluded that the law was not clearly established “on the point of whether sheriffs in Virginia can lawfully terminate for political affiliation reasons dispatchers with privity to confidential information.” Pike, 301 F.3d at 186 (Hamilton, J., concurring) (emphasis added).[5] The concurrence prefaced its discussion of the sheriffs entitlement to qualified immunity with a statement upon which the majority here relies: the “law in this circuit is clear that sheriffs in Virginia have the right to lawfully terminate their deputies for political affiliation reasons.” Id. at 186 (citing Jenkins ).
But, this assertion was clearly dicta, because Pike did not involve sheriffs deputies.[6] And, privity to confidential informa *401 tion, upon which Pike’s holding turned, is not at issue here. The majority acknowledges that the Pike concurrence overstated the holding of Jenkins. Maj. Op. at 393. As of December 2009, Jenkins, as well as Stott and Knight, were part of the clearly established law of this circuit. In my view, it sets a troubling precedent if this circuit’s clearly established law can be undone by dicta.
Stott emphasized the importance of analyzing job duties in cases such as this one. Speaking en banc, the Jenkins Court expressly admonished sheriffs that “courts examine the job duties of the position, and not merely the title, of those dismissed.” Jenkins, 119 F.3d at 1165 (emphasis added). And, Knight reinforced that point, characterizing it as the “central message of Jenkins.” Knight, 214 F.3d at 549. Knight also made clear that a sheriff may not terminate a jailer for political reasons, even if the jailer took an oath as a law enforcement officer. See Knight, 214 F.3d at 551. Pike did not alter any of this.
The salient facts of this case are so close to the facts in Knight that any reasonable sheriff would have predicted that both cases would yield the same result. To the extent that there is any distinction between Knight and this ease, it concerns only the title of the positions held by the employees. Yet, it was clearly established that the title itself is of no legal significance. Therefore, Sheriff Roberts should have known that he could not discharge his jailers on the basis of their political affiliation.
The majority is correct in stating that, in considering whether the law was clearly established for purposes of qualified immunity, we look to the perspective of a layperson, not a lawyer. See Maj. Op. at 393-94. And, as the Supreme Court recognized in Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), the “contours” of the constitutional right “ ‘must be sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right.’ ” (Citation omitted). Yet, the Supreme Court also underscored that the “very action in question” need not have “ ‘previously been held unlawful’ ” if, “in the light of preexisting law the unlawfulness [is] apparent.” Id. (citations omitted). See also Wilson v. Kittoe, 337 F.3d 392, 403 (4th Cir.2003) (qualified immunity may be denied even in the absence of “ ‘a ease holding the defendant’s identical conduct to be unlawful....’”) (citation omitted).
“Qualified immunity extends to protect officials ‘who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful’ ” Williams v. Ozmint, 716 F.3d 801, 805 (4th Cir.2013) (quoting Henry v. Purnell, 652 F.3d 524, 531 (4th Cir.) (en banc), cert, denied, — U.S.-, 132 S.Ct. 781, 181 L.Ed.2d 488 (2011)); accord Durham v. Homer, 690 F.3d 183, 188 (4th Cir.2012). It is intended to “protect[] public officials from ‘bad guesses in gray areas.’ ” Durham, 690 F.3d at 190 (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.1992), cert, denied, 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993)). There were no gray areas here.
In 1997, this court delivered an unequivocally clear message to lay sheriffs. Directly addressing sheriffs, the Jenkins Court announced: “We ... caution sheriffs that courts examine the job duties of the position, and not merely the title, of those dismissed.” Jenkins, 119 F.3d at 1165. Any person capable of serving as a sheriff surely would have understood that directive, which was subsequently reiterated in Knight, and would have grasped what all the members of this panel agree was “the law ... in December 2009 regarding the legality of a sheriff firing a *402 deputy for political reasons.” Maj. Op. at 393.[7]
In sum, Sheriff Roberts’ dismissal of Carter, McCoy, and Dixon on the basis of their political allegiance, if ultimately proven, cannot be excused on the basis of qualified immunity. Therefore, I respectfully dissent from the portion of the majority opinion that upholds the finding of qualified immunity for Sheriff Roberts with respect to the First Amendment claims lodged by Carter, McCoy, and Dixon.

. As the majority observes, both the free expression and political affiliation claims of Carter, McCoy, and Dixon stand or fall on the question of whether those plaintiffs come within the exception to the Elrod-Branti rule because, “in cases in which the Elrod-Branti exception applies, and an employer thus can terminate his employees for political disloyalty, he may also terminate them for speech that constitutes such disloyalty.” Maj. Op. at 375 n. 5. Accordingly, the qualified immunity analysis applies equally to the free expression and political affiliation claims of these three deputies.

. Because the concurring justices’ votes were necessary to the judgment, their more narrow view stated the holding of the Court under the "narrowest grounds” doctrine of Marks v. United States, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

. In two subsequent cases, the Supreme Court extended the Elrod-Branti doctrine in ways that are not germane to this case. See Rutan v. Republican Party of Illinois, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (holding that Elrod-Branti doctrine also applies to “promotion, transfer, recall, and hiring decisions”); O’Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (holding that Elrod-Branti doctrine applies "where government retaliates against a[n] [independent] contractor, or a regular provider of services, for the exercise of rights of political association or the expression of political allegiance”).

. According to the Knight majority, the record was clear that Knight never took a law enforcement officer's oath. Knight, 214 F.3d at 546. The dissent disagreed. See id. at 555 (Widener, J., dissenting). But, of significance here, the majority determined, in the alternative, that “even if Ms. Knight did take such an oath, it would not change our decision.” Id. at 551 (majority).

. The opinion, although labeled a concurrence, was joined by one of the other two judges on the panel.

. "Dictum is ‘statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding — that, being peripheral, may not have received the full and careful consideration of the court that uttered it.’ ” Pittston Co. v. United States, 199 F.3d 694, 703 (4th Cir. 1999) (citation omitted); accord New Cingular Wireless PCS, LLC v. Finley, 674 F.3d 225, 241 (4th Cir.2012).

. The majority has correctly disregarded Sheriff Roberts’ subjective understanding of the law in applying the objective analysis called for by the qualified immunity doctrine. See Maj. Op. at 394 n. 22. It is worth noting, however, that there is no indication that Sheriff Roberts was laboring under a misapprehension of the law. At his deposition, Roberts stated that he did not believe he was entitled to fire the plaintiffs "for political reasons.” JA 96. Instead, Roberts disputed plaintiffs’ claim that he fired them for political reasons. As the court unanimously concludes, see Maj. Op. at 380-83, there are genuine disputes of material fact as to the basis for Roberts' termination of Carter, McCoy, and Dixon.